# Donohugh's Appeal. Donohugh *versus* The Library Company of Philadelphia.

1. A purely public charity within the meaning of art. 9, sect. 1, of the constitution, which provides that the legislature may exempt from taxation, "institutions of purely public charity," is not necessarily one solely controlled and administered by the state, but extends to private institutions for purposes of purely public charity and not administered for private gain.

2. The Library Company of Philadelphia permits the use of its library: 1. By *all* persons within the library building, free of charge or fee of any kind; 2. By *all* persons who desire to take out books for a small hire and leave a deposit as security therefor; 3. By members who pay an annual fee for the privilege of taking out books. These members have the further privilege of voting for the managers, and are nominally the owners of the library. No dividends are paid, but the entire income is dedicated to the expenses and purchase of books: *Held*, that such an institution is a purely public charity within the meaning of the constitution.

3. The essential features of a public use are, that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefinite or unrestricted quality that gives it its public character.

4. The Act of May 14th 1874, providing that "all hospitals, universities, * * * and institutions of learning, benevolence or charity, with the grounds thereto annexed, and necessary for the occupancy and enjoyment of the same, founded, endowed or maintained by public or private charity, shall be exempt from taxation," is constitutional, and The Library Company of Philadelphia is clearly within the exemption therein provided.

February 18th 1878. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and TRUNKEY, JJ. WOODWARD, J., absent.

Appeal from the Court of Common Pleas, No. 2, of *Philadelphia county:* Of January Term 1878, No. 136.

This was a bill in equity, filed by The Library Company of Philadelphia, against William J. Donohugh, Collector of Delinquent Taxes of the city of Philadelphia, for an injunction to restrain defendant from proceeding to levy and collect an amount equal to the legal tax rate for the year 1876, on the library and library building of the complainant.

The bill set forth that the corporation complainant was founded in 1731, by Benjamin Franklin, James Logan and others, as an institution for the advancement of learning and the more useful dissemination of knowledge; that, in 1742, John, Thomas and Richard Penn, proprietaries of Pennsylvania, by letters-patent, created the company complainant a corporation; that complainant is a trustee under the will of James Logan of certain real estate and a collection of books known as the "Loganian Library;" that this collection of books exceeds ten thousand volumes, and is one of the most valuable of the kind in the United States, and is absolutely free to the public; that additions have also been made to the library of complainant by its association with other library companies, and by numerous gifts and bequests of books from time to time, so that the collection therein now exceeds 100,000 volumes; that the corporation is composed of members, and is maintained by their annual contributions, and from the income derived from such property as has been given to it, and from fees paid for the use of the books from persons not members; that all the profits and income of the corporation, after defraying the necessary expenses of maintenance, are applied to the purchase of books; that the institution is managed by twelve directors, annually chosen by the members, who receive no compensation for their services; that the use of the books is given, 1. Without charge or compensation to all persons using them within the library building; 2. To all members, with certain limitations as to the number of volumes that may at any time be taken for use without the building; 3. To all persons, for a small compensation, who wish to use the books without the building, and give security for their return; that the original purpose for which the corporation was created was the collection and use of books by the members at their homes, as a circulating library; that it was the first of that kind in this country, and has ever since preserved its character; that the profits arising from subscriptions and other sources are devoted exclusively to the expense of the library and to its increase, and are not employed for the pecuniary use or benefit of the members; that complainant is a corporation for charitable and literary uses, and from the first organization of the library to the present time has not been considered a proper subject of taxation, and that its building, which is used exclusively for library purposes, has been specially exempted by the Board of Revision of Taxes, from whose decision no appeal was taken, and that it is therefore conclusive.

[Donohugh's Appeal.]

The bill then prayed that it may be declared that the complainant is a purely public charity, as well as an institution of learning, benevolence or charity; or, in the alternative, that it be decreed that the exemption as aforesaid declared by the Board of Revision is binding and conclusive upon the defendant; and for an injunction.

The affidavit of Mr. Lloyd P. Smith, librarian, on behalf of plaintiff, repeated the allegations of the bill. There was annexed to it a copy of the memorial of the Library Company to the Board of Revision of Taxes, upon which they rested their decision exempting the library building.

There was an affidavit by the defendant of the properties which, in his opinion, are to be classed as institutions of purely public charity, and therefore exempt.

. There was also a letter by the late city solicitor to the counsel for plaintiff, and the reply to it, and a copy of the rules of the library, which, by agreement, were treated as affidavits. . They show the present number of shares to be about 960, which cost originally $40 each. The market value is less, being from $25 upwards. Transfers are subject to the approval of the directors. The annual subscription is $8, if paid promptly, producing annually $7800.

The rules of the library were also in evidence, showing the terms on which the books can be used.

No answer was filed by the defendant.

The court, Mitchell and Fell, JJ., awarded the injunction. Hare, P. J., who is a director in the library, did not sit in the case. In the opinion of the court, Mitchell, J., said:—

"Article 9, section 1, of the new constitution of Pennsylvania, declares: 'All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws; but the General Assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, and institutions of purely public charity.'

"The Act of May 14th 1874, Pamph. L. 158, passed to carry into effect this constitutional provision, provides that 'all churches, meeting-houses, or other regular places of stated worship, with the grounds thereto annexed, necessary for the occupancy and enjoyment of the same; all burial-grounds not used or held for private or corporate profit; all hospitals, universities, colleges, seminaries, academies, associations, and institutions of learning, benevolence or charity, with the grounds thereto annexed, and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity,' together with public school-houses, court-houses, jails, &c., are hereby exempted from all

and every county, city, borough, road, and school tax, with a proviso that the exemption shall not extend to property not in actual use for the purposes specified, and from which any income or revenue is derived.

"This is the legislation, constitutional and statutory, by which this case must be decided. The constitution does not, of itself, exempt any property; it merely permits the legislature to do so within certain limits. The first question, therefore, is whether the complainant's case is within the Act of 1874, and this we think so clear that it may be considered and dismissed briefly. The complainant is an 'association or institution of learning.' The educational influence of great libraries has been recognised by all civilized people in all ages. They have been the refuge and preservers of knowledge in the darkest times of ignorance and superstition; the source and rallying point of awakened interest in philosophy and science, wherever the human mind has aroused itself to a new search for intellectual light; and the glory and pride of nations, in exact proportion as they have attained a higher plane of enlightened and progressive civilization. It is the concurrent and universal opinion of scholars that no single event in recorded history has been so great a misfortune to the interests of pure learning as the destruction of the Alexandrine Library.

"The complainant was founded in 1731, by Benjamin Franklin, James Logan, and others, not only as an institution of learning, but undoubtedly as a charity, within the long-settled and clearly-defined legal meaning of that term. In 1742, it was incorporated by letters-patent from the proprietaries of Pennsylvania, who recited in their patent that the founders had, 'at a great expense, purchased a large and valuable collection of useful books, in order to erect a library for the advancement of knowledge and literature in the city of Philadelphia.' This library subsequently received the accession of the library of James Logan, in its time, and for many years afterwards, the most valuable collection of books in America, and has, from time to time, been added to and endowed by gifts, bequests, and accumulations from various sources, including subscriptions and annual payments by members of the corporation. We do not think it admits of doubt that it is not only an institution of learning, but that it is also founded, endowed, and maintained by charity, within the meaning of the Act of 1874.

"But there remains the further and more important question, whether the Act of 1874 is constitutional. It is conceded that the legislature cannot go outside of the class of cases in which the constitution permits exemption from taxation, but it is to be remembered that the provision of the constitution is not a grant of power to the legislature, which belongs elsewhere, and is therefore to be strictly construed as in derogation of the people's right. On the contrary, it is a restriction upon a legislative power which would

otherwise be unlimited and unquestionable. It is a tying up of the legislative hand, and, therefore, to be. construed in a liberal spirit to remedy the mischief at which it was aimed, and not further unnecessarily to fetter the proper governmental powers of the people's representatives.

"The power of a court to set aside the legislative will is unknown, except in American jurisprudence. The authority of an Act of Parliament is supreme and unquestionable in the country from which we derive our laws and the fundamental principles of our political liberty, and in the early days of the republic, it was not without grave doubts and serious opposition, that the judicial power was carried to this extent even here. And though it is now firmly settled that the courts are the ultimate interpreters of the constitution, and that all acts or legislation which are forbidden by the constitution are to be declared void, yet it is equally well settled that this power can only be exercised where there is a clear and undoubted infringement of the constitution. In all cases the presumption is in favor of the validity of the legislative act, and where there is room for doubt, this presumption must prevail. Especially is great respect due to the legislative construction of a constitutional provision where, as in the present case, it is a question, not of private right, but of public policy. For the preservation of individual rights, whether as between man and man, or between the citizens and the public, or the government, the courts are the natural guardians, with special advantages of training and modes of procedure for the attainment of justice, but for the preservation, as well as for the determination in the first instance, of matters of state policy, the proper tribunal is the legislature; and its construction of a constitutional mandate upon this subject, must be held binding and conclusive until shown clearly and beyond all question, to be in violation of the intention of the people in their sovereign expression of their will through the constitution.

"These principles are trite; but the haste and crudity of. much recent legislation has required such frequent exercise of the judicial power to keep it within constitutional bounds, that the delicacy and exceptional nature of the power is too commonly lost sight of, and I have thought it proper to recall its true limits, familiar as they are, because of the tone of argument for the defendant in the present case, which assumes that as exemption from taxation is a special privilege, it must be clearly shown, and that it is, therefore, sufficient for the defendant to show a doubt to defeat the complainant's case. Such certainly is the rule in determining whether or not exemption has been granted to any particular claimant by an Act of Assembly. The sovereign power of taxation is never to be taken away except by a clear grant. But where the legislature has clearly intended the exemption, the validity of that act must be assumed like all others, until clearly shown to be beyond the legislative authority.

[Donohugh's Appeal.]

"Bearing these principles in mind, let us proceed to the examination of the section of the constitution upon this subject. As already said, it exempts nothing, but it authorizes the legislature, by general laws, to exempt, speaking generally: First, public property; second, actual places of religious worship; third, burial-places not for profit; and fourth, 'institutions of purely public charity.' The last is the only class with which we are directly concerned, though, as we shall see, some light can be had from the language used in describing the others.

"Looking at this provision in the light of Lord Coke's rules for the interpretation of statutes—what was the old law, what was the mischief in it which was meant to be remedied, and what was the remedy prescribed—we can have little doubt that this clause was intended to abolish favoritism in the form of special legislative grants of exemption from taxation. The learned counsel for the complainant have collected together a list of the one hundred and thirty acts of the state legislature, passed between 1850 and 1873, exempting private or corporate property from taxation, and they have been summarized as follows :—

| | | |
|---|---|---:|
| 1. Institutions of public benevolence for the poor, | . . | 20 |
| 2. Hospitals, | . . . . . . . | 16 |
| 3. Literary, scientific and educational institutions, | . . | 19 |
| 4. Religious—churches and parsonages, | . . . . | 32 |
| 5. Cemeteries or burial-places, | . . . . | 15 |
| 6. Military institutions, | . . . . . | 6 |
| 7. Institutions of private benevolence, | . . . | 13 |
| 8. Miscellaneous and doubtful, | . . . . | 9 |
| Total, . . . . . . . . | . | 130 |

" Some of these were, at best, only private charities, and some of them, notably in the fifth class—cemeteries—were not charities at all, but mere trading corporations for private and individual profit. The large majority, however, were true charities, both in the legal and popular sense, and were worthy objects of legislative aid; but it was felt to be a hardship that that aid should be rendered as a matter of individual favoritism granted to one and withheld from another, as the views of successive legislatures might be more or less liberal on the subject. To remedy this evil, the new constitution provided, first and chiefly, that all exemptions from taxation should be by general laws; and secondly, that those laws should include only the classes of property named. Bearing in mind that institutions of public benevolence for the poor, hospitals, literary, scientific and educational institutions, and most of the military institutions in class 6 above (being like the Lincoln Institute and Soldiers' Orphan Schools), are all included under the general class of public charities, it is plain that, tried even by the standard of

[Donohugh's Appeal.]

the present constitution, the long list of exemptions in the one hundred and thirty acts referred to would still be valid, except so for as they include church property not used for public worship, cemeteries for private profit, and institutions of private benevolence. This comparison of the legislation of the last quarter of a century on the subject, with the legislation still permitted under the present constitution, demonstrates clearly that the primary intent of this constitutional provision, as of so many others in the same instrument, was not so much to limit the scope of exemptions to charities as to destroy the obnoxious feature of favoritism by special legislation ; the key-note to the whole clause is in the permission to exempt only by general laws.

"But though this was certainly the main purpose, it is also equally clear that the provision does go a step farther, and put a limit upon the legislative power to exempt which was before unlimited. It remains, therefore, still to be considered whether the legislature, in extending the exemption to institutions of learning, such as the complainant, has transgressed the limits laid down by the words 'institutions of purely public charity.'

"That the complainant is a charity in the legal sense of the word does not admit of question. It is equally clear that it is also a charity in the somewhat narrower and more popular sense in which we must interpret the words of a popular instrument like the constitution. The commonest and most familiar meaning of charity is almsgiving, but that narrow definition is not the primary or most important one given in the dictionaries or sanctioned by the usage of English-speaking people. The moment the word is used in connection with the present subject-matter of charitable gifts or charitable institutions, the popular as well as legal mind takes in at once its wider scope of good-will, benevolence, desire to add to the happiness or improvement of our fellow-beings. It is in this sense that, not to mention the numerous other illustrations, our own local gifts of Elliott Cresson, for the planting of shade trees in the streets of Philadelphia (Cresson's Appeal, 6 Casey 437), and a gift to a volunteer fire company for the protection of the property of the citizens (Thomas *v.* Ellmaker, 1 Pars. 98), have been recognised as charities, both in the legal and in the popular estimation.

"But is the complainant a *public* charity? To answer this question we must look to the facts of the case.

"By the original rules of Franklin and the other founders, the librarian was required to permit 'any civil gentleman to peruse the books of the library in the library-room,' and in the same spirit the charter, which is the fundamental law of the corporation, and the by-laws made under it, permit the use of the library : 1. By *all persons* within the library building free of charge or fee of any kind. 2. By *all persons* who desire to take out books, and for

that privilege pay a small hire, and leave a deposit as security for the return of the books. 3. By members or commutors, who pay an annual sum instead of a separate hire for each time of taking out a book.

" The essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this *indefinite* or unrestricted quality that gives it its public character. The smallest street in the smallest village is a public highway of the Commonwealth, and none the less so because a vast majority of the citizens will certainly never derive any benefit from its use. It is enough that they may do so if they choose. So there is no charity conceivable which will not, in its practical operation, exclude a large part of mankind, and there are few which do not do so in express terms, or by the restrictive force of the description of the persons for whose benefit they are intended. Thus, Girard College excludes, by a single word, half the public, by requiring that only *male* children shall be received; the great Pennsylvania Hospital closes its gates to all but *recent* injuries, yet no one questions that they are public charities in the widest and most exacting sense.

" Tried by this standard, it would seem clear that the Philadelphia Library is public so far at least as regards the use of the books within the building; that is free to all alike without charge. Is its public character destroyed by any special privileges to members or other individuals? We cannot see that it is. Some system of government, some regulations of administration, are necessary in all large bodies; provided they be reasonable and not repugnant to the general purpose, they are valid and do not affect the character of the institution. The general privilege of reading the books within the building, and under the supervision of the librarian, being conceded freely to all, the further privilege is sought of taking books away to be read at home, and this we find is also conceded to all persons alike, on the condition that a deposit shall be made of the value of the book to insure its return, and a sum paid for its hire or loan. A step farther brings us to the third and last privilege, that of members, who, instead of paying the hire of each book from time to time, as they take it out, pay a single annual sum as an equivalent. The principle of commutation is familiar. It is as old as the history of tithings in England, as universal as the convenience and the necessities of business everywhere. The law prohibits a common carrier from discriminating between persons; it requires him to carry all men the same journey for the same price; yet there is probably no railroad in the country that does not issue season or mileage tickets, or commutation in some form or other, to its local customers, and this has never been held to impair or infringe upon its public character as a common carrier. Such regulations, within reasonable limits, are mere

[Donohugh's Appeal.]

administrative details, necessary in all but the most insignificant business, and not in any way affecting the general character of the institution.

"One other privilege of the members, besides this commutation of book hires, may also be included in the same class of administrative details—the privilege of voting for the managers who conduct the affairs of the library. Some form of government is necessary. The managers are trustees, and some mode must be provided for their appointment. The particular mode selected is a matter for the founders or the state in granting a charter; but having been adopted, it does not in any way affect the public character of the corporation.

"Next, and last, we have to consider the force to be given to the word 'purely' in the constitutional phrase, 'purely public charity.' In this connection, and in its ordinary sense, the word purely means completely, entirely, unqualifiedly, and this is the meaning we must presume the people to have intended in adopting it in their constitution. Plainly, then the charities authorized to be exempted are those that are completely and entirely public. The phrase is intended to exclude those charities which are private or only quasi public, such as many religious aid societies, and also those which, though public to some extent or for some purposes, have, like Masonic lodges and similar charities, some mixture of private with their public character. The true test is to be found in the objects of the institution. Are they entirely for the accomplishment of the public purpose, or have they some intermixture of private or individual gain? We get a clear and strong light on this subject from the words of the same clause of the constitution descriptive of burial places which may be exempted, to wit, those 'not used or held for private or corporate profit.' Such places are unquestionably public charities, and the specification of them might have been omitted without impairing the force of the provision. But, as we have seen, the exemption of cemeteries had been recently abused by including some that were wholly for private profit, and the constitution was made to emphasize its prohibition of such acts by specifically naming those burial-places which alone might be exempted. Having done this, it passed on to name concisely and collectively all other institutions of purely public charity. The phrase might have been expressed, 'places of burial and other institutions of public charity, not for private or corporate profit.' The language used, taken as a consistent and consecutive whole, shows that this is its plain meaning.

"Is the complainant within this description?

"The library is a trust, and while it is the property of the corporation, and therefore in a certain sense of the corporate stockholders, yet it is not their property in any full, legal or commercial sense. They cannot sell it and divide the proceeds among them-

selves as individuals—that would be a violation of the trust, which a court of equity would be bound at once to restrain. Being then a trust, its purpose and scope must be looked for in the grant. It is not a question of how the revenue is derived, but to what purpose and with what intent is it devoted. The purpose of this trust is clearly set forth in the charter; it is 'to erect a library for the advancement of knowledge and literature in the city of Philadelphia,' and we fail to discover in it any taint of private profit.

"I have already discussed the members' privilege of commutation by annual payment for the hire of books, and it is said in the charter that this payment shall be 'for the increase and preservation of said library.' I have endeavored to show that this privilege, almost the only one in which any distinction is made between the members and the general public, is not an undue privilege or justly obnoxious to the charge of being a private profit. But even this privilege is a regulation, not a part of the fundamental law of the corporation; and if it were held to be an undue privilege, repugnant to the public character of the charity, the result would be, not that the charity would become less purely public, but that the privilege would be void.

"I have not thought it necessary to notice in detail the authorities cited by the learned counsel on either side. Some of them are very close and decisive upon the points made in the case; but the subject is extensive, and this opinion has already reached a very great length, and I have therefore preferred to rest the case upon general principles, which I believe to be unquestionable.

"It results from the foregoing that we hold that the complainant is exempted from taxation, as an institution of learning, by the Act of May 14th 1874, and that as to such exemption the act is within the terms of the constitution, and is valid and binding upon the taxing power of the city of Philadelphia.

"The injunction prayed for is awarded."

From this decree the defendant appealed.

*J. Howard Gendell*, Assistant City Solicitor, and *Wm. Nelson West*, City Solicitor, for appellant.—The duties of the Board of Revision are confined to mere valuations, and have no relation whatever to questions of liability to or exemption from taxation: Act of March 14th 1865, Pamph. L. 320, Purd. Dig. 1375, pl. 123; Act of February 2d 1867, Pamph. L. 137, Purd. Dig. 1378, pl. 137; Act of April 12th 1873, Pamph. L. 715, Purd. Dig. 1821, pl. 4. All the acts of exemption were repealed by the new constitution: Londonderry *v.* Berger, 7 Legal Gazette 231. The Act of 1874 is an enabling act, and to be construed strictly against exemption: Academy of Fine Arts *v.* Philadelphia, 10 Harris 496. That act was intended to limit exemptions to charities of a "purely public character." This library is not a charity within the mean-

[Donohugh's Appeal.]

ing of the constitution and the act, because it is endowed by the
sale of stock and maintained by annual subscriptions, and has a
profit or revenue derived from the hire of books. And as the
members have privileges not enjoyed by the general public, the
institution is to that extent for private advantage. It is not exclu-
sively for the public benefit: School Directors of Upper Darby *v.*
Directors of St. Stephens' Church, 34 Leg. Int. 291; Swift *v.*
Easton Beneficial Society, 23 P. F. Smith 362; Academy of Fine
Arts *v.* Philadelphia, *supra;* St. Mary's College *v.* Crowe, 10
Kansas 442; Cincinnati College *v.* The State, 19 Ohio 110;
Carne *v.* Long, 2 DeGex, Fisher & Jones 75. There is a dis-
tinction between a charitable gift and a charitable institution.
It does not make this library a charity because it is the trustee of
certain books or libraries, given it by will or otherwise. The public
must have the same use as the stockholders. It cannot confer spe-
cial benefits on members and claim exemption. The corporation
derives a profit from the hire of its books, and it is not material
that there is no cash dividend. The stock is also bought subject
to the approval of the board of directors, and under such a regula-
tion every one could not become a member, for if a member object,
how could the stock be transferred? If the decision of the court
below is sustained, there are a number of institutions which will
claim exemption.

*Wm. Henry Rawle* and *R. C. McMurtrie,* for appellee.—This
library is a "purely public charity," within the meaning of the
constitution. Charity, in its legal sense, includes not only gifts for
the poor, but endowments for the advancement of learning or for
any useful and public purpose which lessens the burthen of govern-
ment: Vidal *v.* Girard's Ex'rs, 2 Howard 128; President of the
United States *v.* Drummond, 7 H. L. C. 141 n.; Trustees of the Brit-
ish Museum *v.* White, 2 Sim. & Stu. 595; Jones *v.* Williams, 2
Amb. 652; Jackson *v.* Phillips, 14 Allen 539; American Academy
of Fine Arts and Sciences *v.* Harvard College, 12 Gray 583; Gerke
*v.* Purcell, 25 Ohio St. 229. Gifts to establish libraries are clearly
such: Drury *v.* Inhabitants of Natick, 10 Allen 169. The appel-
lee is an institute of learning within the Act of 1874. It is true
statutes of exemption are to be strictly construed, but this rule does
not apply where a statute merely carries out a provision of the con-
stitution and does not grant anything not before possessed by the
citizen. It is the duty of the state to provide for her poor, to en-
courage religion, and educate the children within her borders, and
if any body of citizens contribute to these objects and assume the
place of the state they are entitled to be subrogated to her rights so
far as taxation is concerned. The test of a public charity is whe-
ther it is, to any reasonable extent, open to the indefinite public.
Location and means of support and the exclusion of a part of the

[Donohugh's Appeal.]

public are immaterial: Drury v. Natick, supra; Thomas v. Ell-maker, 1 Pars. Eq. Cas. 98; Attorney-General v. Heelis, Id.; 2 Perry on Trusts 707 n.; Miller v. Porter, 3 P. F. Smith 292; Warde v. Manchester, 56 N. H. 508. In twelve of the United States legislatures have enacted that public libraries come within the scope of provisions similar to those in our own constitution. In Gerke v. Purcell, 25 Ohio St. 229, the exact question now under discussion, whether the statute was broader than the constitution, was decided in our favor. It is state policy to foster such institutions as these libraries. If they are taxable, they are liable to confiscation, for their income is wholly inadequate to the purpose of taxation. The words "purely public charity" are a direction to the legislature to prohibit what was an old and flagrant abuse, the exemption of private property, such as Odd-fellows' halls. These words are terms of art, and are as technical a definition of a class of property as a freehold. This library is a charitable use, and it is the duty of the state to see that it is administered for the charity. The ground upon which this charity was granted exemption was that of "being a public beneficial use for the benefit of the community as a community."

[Chief Justice AGNEW.—Is there any discussion in the debates of the constitutional convention in relation to this word "purely"?]

I believe not.

[Chief Justice AGNEW.—Article 3, sect. 17, of the constitution, provides that no appropriation shall be made to any charitable or educational institution not under the absolute control of the Commonwealth, &c. Can this clause and that of article 9, sect. 1, be construed together so as to ascertain the kind of public institutions which were referred to in the use of the word "purely"?]

We think there is an obvious difference. The first was intended to punish the abuse of special appropriations of money for particular institutions; the last only intended to limit exemption to those institutions from which the general public derived a benefit. It is contended likewise that the decision of the Board of Revision cannot be reversed in this collateral proceeding.

The judgment of the Supreme Court was entered, March 4th 1878,

PER CURIAM.—The exemption claimed in this case falls clearly within that clause of the Act of May 14th 1874, Pamph. L. 158, which exempts from taxation all "associations and institutions of learning, benevolence or charity, with the grounds thereto annexed, and necessary for the occupancy and enjoyment of the same, founded, endorsed and maintained by public or private charity." This leaves the true question upon that clause of the 9th article of the new constitution, which authorizes the General Assembly to exempt "institutions of purely public charity." On this, the pivot of the

[Donohugh's Appeal.]

case, the opinion of the learned judge of the Common Pleas is so full, clear and accurate, we deem it unnecessary to add anything to what he has said so well.

One point, perhaps, we should notice. The word "purely" must be interpreted so as to confine its qualification of a "public charity" to those institutions solely controlled and administered by the state herself, or so as to extend it to private institutions for purposes of purely public charity, and not administered for private gain. We prefer the latter interpretation, as declaring the true meaning of the constitution, and subserving best the public interest. On this point, in its application to the Library Company, the opinion of the learned judge fully sustains the claim of the company to be an institution of this character.

> Decree affirmed, with costs of the appeal, and the record ordered to be remitted for further proceedings.