## Episcopal Academy *v.* Phila. et al., Appellants.

[Marked to be reported.]

*Purely public charity—Denominational schools.*

Whatever is done or given gratuitously in relief of the public burdens or for the advancement of the public good is a public charity. Where the public is the beneficiary the charity is public, and where no private or pecuniary return is reserved to the giver or to any particular person, but all the benefit resulting from the gift or act goes to the public, it is a purely public charity, the word " purely " being equivalent to wholly.

A denominational school property, vested in trustees, for the purpose of affording encouragement to the education of youth, is a purely public charity, although the school is not open in the same way to the general public as to persons connected with the religious denomination, but the general public are admitted as vacancies occur, and, when admitted, upon the same terms with all other pupils.

*Maintenance of charity—Tuition fees—Taxation.*

An institution founded and endowed as a purely public charity, does not lose its character as such, under the tax laws, if it receives a revenue from the recipients of its bounty sufficient to keep it in operation. It must not go beyond self-support, but so long as the trustees of the school manage it as a charity, giving the benefit of what might otherwise be profit to the reduction of tuition fees or the increase of the number of free scholars, their school buildings are entitled to exemption under the Act of May 24, 1874.

Argued March 28, 1892. Appeal, No. 12, Jan. T., 1892, by defendants, John Taylor, receiver of taxes, and the city of Phila., from decree of C. P. No. 4, Phila. Co., Dec. T., 1886, No. 896, granting injunction. Before PAXSON, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Bill for injunction to restrain collection of tax.

The bill alleged that plaintiff by its "fundamental laws" or organization adopted a name, provided for selection of trustees and a head master, and further provided in § 4: "A convenient number of youth should be taught gratis, as soon as the funds shall appear to afford it; in the meantime it shall be kept in view, as an object of the institution; and all gifts or bequests for this special purpose shall be kept a fund, to be applied to no other purposes whatever. By Act of March 29, 1787, it is provided in § 1 that " it is right and proper to afford all due encouragement to the education of youth, and to the

establishment of useful seminaries of learning within this state," and that " the trustees of the said academy have petitioned to be incorporated for the more effectually carrying into execution the original design of the said subscribers." Section 2 provides " that there shall be established in the city of Philadelphia an academy for the education of youth in useful branches of learning." Section 3 authorizes the trustees, and their successors, among other things, to receive the rents, issues and profits, income and interest of the property, and to apply the same to the purpose, use and support of the said academy. By § 7 ten thousand acres of land were granted by the state to the trustees for the purposes of the trust. This act and the supplement of April 15, 1834, were made part of the bill.

In the autumn of 1788, a free school for boys and another for girls had been opened. Various charitable bequests were received by the academy, some for general purposes and some in aid of free scholars. In February, 1840, the trustees secured the lot on the southwest corner of Locust and Juniper streets. With the proceeds of the land given by the state, together with other funds, the present buildings were erected with accommodation for 200 pupils. In reliance upon tax-exempting legislation the trustees have enlarged and improved the academy building. The academy is maintained from the income derived from property given to·or purchased by it, and from fees and tuition, which are at a much lower rate than that of other institutions of a like grade. No rent is charged and all receipts and income, after defraying the expenses, are applied to increasing the number of free scholars, which has ranged from sixteen to twenty. Half-pay scholars have averaged in number from fifteen to twenty. Any surplus above the necessary expenses is funded to enlarge free scholarships. Every $2,500 accumulated provides an additional free scholarship. The premises at Locust and Juniper streets are used exclusively for educational purposes, including chapel, lavatory, gymnasium, etc. They have never been used for any purposes yielding any income or pecuniary profit to any one, and are necessary, etc.

The bill alleged an assessment of $70,000 for purposes of taxation for the year 1886, and prayed for an injunction to restrain its collection.

The answer denied that the premises were exempt from taxation, etc.

The court below, upon bill and affidavits, granted, and continued upon hearing, a preliminary injunction. This order was reversed by the Supreme Court on appeal: Hunter's Ap., 22 W. N. 361, s. c. 1 Mona. 1. When the record was remitted, an answer was filed, William W. Porter was appointed examiner and master, and proofs were taken. In 1846, the school was reorganized. The master found in part as follows:

" There are, and have been since the school was reorganized, three kinds of scholars in the academy—full-pay, half-pay and free scholars. The full-pay scholars pay less for tuition than is paid in any institution of like grade conducted for profit. All applicants who desire it are admitted at half-pay rates and are placed on the free roll as soon as vacancies occur.

" Though a resolution of the board of trustees at one time gave preference in the first instance to ten sons of clergymen of the Protestant Episcopal faith, no effect was ever given to this resolution, and the school has, to the extent of its means and capacity, been open to all children without distinction of creed or denomination.

" The school buildings and other property belonging to the academy were purchased with the proceeds of the sales of the lands donated by the state and private donations made for the purpose.

" The academy is maintained, to a large extent, by the fees paid by the full-pay and half-pay scholars, though it was proven before the master that without the ownership of the buildings and other property donated to it, it would be impossible to conduct a free school to any extent, to accept scholars at the half-pay rates, or to maintain the low rate of charges made to what are known as the full-pay scholars. If the academy were required to rent suitable buildings for its purposes an additional expense of at least $10,000 per annum would be incurred. A portion of the income is derived from sums donated and set apart for free scholarships.

" The trustees receive no compensation for their services, and the institution is free from any element of private gain. Any surplus remaining over current expenses is set apart for the endowment of free scholarships, a new free scholarship

being created for every $2,500 thus acquired. In short, the master finds that the academy is conducted with the aim and object of affording free education to as many scholars as its means and capacity will admit of, and of reducing the cost of education to those who are unable to pay the usual charges for the same. The number of pay scholars has ranged from sixteen to thirty, and the number of half-pay scholars from fifteen to twenty."

The court dismissed exceptions to the master's report and further decreed:

" That the Academy of the Protestant Episcopal Church in the City of Philadelphia is a purely public charity, as well as an institution of learning, benevolence and charity; and that the real estate of the plaintiffs at the southwest corner of Juniper and Locust streets, in the said bill described, is, under the constitution of this commonwealth and under the Act of May 24, 1874, exempt from taxation according to the provisions of the said act. [3]

" That the defendants, their servants and agents, be and they hereby are enjoined and restrained from collecting or attempting to collect taxes for the year 1886, as assessed, upon the lot and building of the complainants situate at the southwest corner of Juniper and Locust streets, Philadelphia. [4]

" That the costs of the cause be paid by the defendant." [5]

*Errors assigned* were (1) dismissing exceptions; (2) confirming report; (3–5) portions of decree as above, quoting them; (6) not dissolving injunction; and (7) not dismissing bill.

Calculations based upon the evidence were submitted to the Supreme Court after oral argument, showing in the year 1885, the following averages: 52 pay pupils at $125; 90½ at $100, and 12½ at $75, aggregating $16,387.51. The half-pay pupils averaged 14½, the free pupils 16½. The expenditures for 1885 were $17,764.71. Dividing the receipts from full-pay pupils by the total number of such pupils the average rate paid is $105.73. Dividing the aggregate expenditures by 186, the average number of all pupils, the average cost per pupil would be $95.50. If the expenses are divided by the number of pay pupils instead of the total number, the average cost would be $114.60. If the free scholars are counted on

both sides in estimating cost per pupil and amount paid per pupil, the cost will exceed the amount paid. The items for other years show the same relative results. These calculations do not include an allowance for rent, the addition of which would make the cost exceed the rate paid, on any basis of calculation.

*E. Spencer Miller* and *Charles B. McMichael,* assistant city solicitors, *Charles F. Warwick,* city solicitor, with them, for appellants.—Plaintiff is not an institution of purely public charity. The full-pay branch of the school is a competitor with private schools. It is in no sense a charity. The destination of the funds does not exempt from taxation the establishment in which the business is carried on. That the charitable object is of the same character can make no difference. If a foundry conducted under a trust to make charity funds is taxable, so is a school. Nor can mere local separation make any difference. If taxable in a neighborhood remote from the free school, the fusion of the free and pay schools could make no difference, except that the whole would be taxable unless the portion subject to taxation could be separated: Y. M. C. A. v. Donohugh, 7 W. N. 208.

The property is not exempt, because an income or revenue is derived from it: Art. 9, § 1, Const.; Act of May 14, 1874, proviso. This proviso, while unconstitutional, under Sewickley Borough v. Sholes, 118 Pa. 165, when it attempts to impose a tax, is constitutional in so far as it operates to limit the exempting effect of the body of the act. It is not limited to the conjunction of non-occupation and productiveness of revenue. Such interpretation would make it nugatory. By the body of the act property owned by and adjacent to a charitable institution, not in actual use, is taxable although no revenue be derived from it: Phila. v. Pa. Hospital, 134 Pa. 171.

The institution is not maintained by charity. The test is substantial maintenance. Where the chief revenue is tuition fees, it is not so maintained: Hunter's Ap., 22 W. N. 361, s. c. 1 Mona. 1. No estimate of the additional sum which the academy would have to pay for rent under other conditions can come into the calculation. It cannot work its landed endowment so that the same shall produce a net revenue and yet

enjoy the privilege of exemption from public tax. Without the addition of $10,000 as a rental, which is excessive upon the estimated value of $70,000, the full rate fees yield a revenue.

In Phila. v. Women's Christian Association, 125 Pa. 572, and Northampton Co. v. Lafayette College, 128 Pa. 132, it did not appear that there was any profit, the charges being less than the actual cost.

*Geo. Tucker Bispham, A. H. Wintersteen* with him, for appellee.—Particular benefits moving to the donors do not destroy the charitable character of a foundation: Fire Ins. Patrol v. Boyd, 120 Pa. 645. A charity is public which is open to the indefinite public: Donohugh's Ap., 86 Pa. 312; and purely public when the idea of private gain or profit is excluded: Burd Orphan Asylum v. School Dist., 90 Pa. 35. Appellee is a purely public charity by its fundamental law and endowment. The funds, placed in the hands of trustees, are to be devoted to teaching a convenient number of youth gratis, as soon as the funds shall appear to afford it. The stamp of charity is on every dollar reaching the treasury. If the property sought to be taxed were an outlying piece of real estate it would not be exempt, but here the charitable nature of the institution is indivisible. In Y. M. C. A. v. Donohugh, 7 W. N. 208, the portion of the building occupied by the charity was held exempt; the portion rented was held taxable under the proviso of the Act of 1874, since declared unconstitutional: Sewickley Boro. v. Sholes, 118 Pa. 165; General Assembly v. Gratz, 139 Pa. 497, 508. Even the full pay rates are less than at other schools and less than cost and therefore charity rates. The ownership of the building, bought with the proceeds of gifts, alone makes even the full pay rates possible.

The object of the donation, or its destination, is the test of its charitable character: Fire Ins. Patrol v. Boyd, 120 Pa. 624. Here every accession to the funds of the academy is a charitable accession. The full-pay pupils, although they receive a benefit are not in the position of purchasers, the charge is less than the value, and the payment is a trust for the charity. In the Y. M. C. A. Case the rents were presumably full rates,

and a pure business transaction. Our case is ruled on this point by Donohugh's Ap., 86 Pa. 306 ; Phila. v. Women's Christian Asso., 125 Pa. 581 ; Northampton Co. v. Lafayette College, 128 Pa. 147.

Burd Orphan Asylum v. School Dist., 8 W. N. 1, was limited to one denomination. Del. Co. Inst. v. Delaware Co., 94 Pa. 163, was a private institution. In Miller's Ap., 10 W. N. 168, and Thiel College v. Mercer Co., 101 Pa. 530, the institutions were not organically purely public charities : 125 Pa. 580.

OPINION BY MR. JUSTICE WILLIAMS, October 3, 1892.

The academy, the appellee, is what may be fairly considered a denominational school. Its name, " The Academy of the Protestant Episcopal Church in Philadelphia," is one of the indicia of its character. The qualifications necessary to eligibility for the office of trustee is another. These are, first, orders in the Episcopal church ; or, second, eligibility to the office of vestryman. The head master of the academy must be a communicant in the Episcopal church. By the plan of organization and the action of 1846 the various Episcopal congregations in the city are authorized to select each one person to be nominated to the trustees as a free pupil, and upon the list of free pupils a preference was given to the sons of clergymen of the Episcopal church to the number of ten. Free scholars are admitted to the academy by the action of the trustees to whom all applications must be made on blanks prepared and furnished by them. Among the questions upon these blanks are the following : " Q. Are the parents, or either, and which of them, communicants of the Protestant Episcopal church ? Q. How long have they or either of them been so, and with what church are they connected ? " The admission of pupils is not limited to children of members of the Episcopal church either by the charter, the rules, or the practice of the school ; but it is quite evident that such children are preferred. This appears by the testimony of the head master and the treasurer. Mr. Hunter, who has been connected with the school for many years, puts the order of preference as, first, " sons of clergymen of the Episcopal church ; " next, "members of our own denomination." When asked for the reason of such preference he answered : " We always like our own household." Other persons are ad-

mitted as pupils both upon the pay list and the free list, when vacancies exist; but they are postponed or rejected if children of the denomination apply in sufficient numbers. The school is not open in the same way to the general public as to persons connected with the Episcopal church, but they are admitted as vacancies occur, and when admitted it is upon the same terms with all other pupils.

This school was founded, as appears by the first section of the Act of March 29, 1787, incorporating it, by " a number of persons of the Protestant Episcopal churches in the city of Philadelphia and others," for the purpose of affording encouragement to the education of youth. It was endowed with the funds necessary for the purchase of a lot and the erection of a school building thereon by its founders and friends, and by the state of Pennsylvania, which gave to it ten thousand acres of the public land.

The title to the property of the corporation is in trustees who hold it in trust for the purposes for which the school was founded. There are no stockholders or other persons who have a pecuniary interest in the property or any right to participate in its earnings, or any control over them, except through the trustees and for the purposes of the trust.

It is maintained almost wholly by the fees for tuition charged to the pupils, who are divided into three classes; those who pay the full price fixed by the trustees for tuition, those who pay half price, and those who are admitted without charge.

The two important questions presented upon these facts are, first, Do the purposes and the organization of the school bring it within the definition of a " purely public charity ? " and, next, Is the institution " founded, endowed and maintained by public or private charity ? "

The definition of charity has been steadily broadening. It was once held to be "whatever is given for the love of God, or for the love of your neighbor, free from any taint or stain of any consideration that is personal or selfish." But the purity and unselfishness of the motive came to be regarded by the courts as important only in the moral aspects of the act, and was not insisted on in determining whether a gift was to a charitable use. In Donohugh's Ap., 86 Pa. 312, charity was defined as something " done out of good will, benevolence, a

desire to add to the happiness or improvement of our fellow beings." The fact that selfish considerations induced the act done was thus left out of view, and the act alone considered. In the recent case of Boyd v. The Fire Insurance Patrol, 120 Pa. 624, another advance was made, and the court held that a corporation acting in aid and ease of the city of Philadelphia in the preservation of life and property at fires, without gain or profit to itself, was a public charity, notwithstanding the fact that among its acknowledged objects was that of lessening the losses of fire insurance companies.

In view of these cases it may be safely said that whatever is gratuitously done or given in relief of the public burdens or for the advancement of the public good is a public charity. In every such case as the public is the beneficiary, the charity is a public charity. As no private or pecuniary return is reserved to the giver or any particular person, but all the benefit resulting from the gift or act goes to the public, it is a " purely public charity," the word " purely" being equivalent to the word " wholly." The education of youth and the support of schools are for the advancement of public good, and money given for such purposes was recognized in England as given for a charitable use, before the statute of 43 Elizabeth.

Our own courts have uniformly held the same doctrine. The school may therefore be regarded as a purely public charity if it can meet the requirements of the law as to the manner of its founding, endowment and support.

The Act of 1874 exempts from taxation such schools as are supported at the public expense, and such others as are founded, endowed and maintained by public or private charity. This school was founded by private persons, who contributed for that purpose. It was endowed by the state of Pennsylvania with ten thousand acres of the public land, in addition to the sums given by its founders. It was evidently founded and endowed by public and private charity. Its funds were invested in the purchase of a lot and the erection and furnishing of a fine school building, except certain small sums specifically given in aid of the free education of pupils. When the building was ready for occupancy, the trustees employed teachers and opened the school, adjusting the rates of tuition with a view to make the school self-sustaining. The large majority of the

pupils pay what is called full rate. A small number pay half rate, and a still smaller number, ranging from ten to twenty, pay nothing. The tuitions, with the income from the gifts for the free school, pay the expenses. In this manner education is afforded to some persons without cost, to some at half cost, and to many more at a less cost than in schools of a like grade. How is this school maintained? It is not by annual gifts, as was the case of Lafayette College, 128 Pa. 132, but by the use of its endowment for the purposes for which it was given. It is free from any element of private gain; and, because of the ownership of its building and lot, assessed at $70,000, and its school equipments, it is able to put the price of tuition below that usually charged in such schools and yet pay the necessary salaries. The property given to the school is so used that, by its use for the purposes contemplated by the givers, the charity is made to support itself. It is not a business organization, conducted for profit, but a charity, conducted with a view to furnish education at its actual cost to a great number of youth who otherwise might be required to pay more for it or forego it altogether. Such was the situation in Phila. v. Women's Christian Association, 125 Pa. 572. In that case it was said that the character of the association as a charity was not destroyed if to some extent it received a revenue from the recipients of its bounty. We are now disposed to go further, and say that an institution that is in its nature and purposes a purely public charity does not lose its character as such under the tax laws if it receives a revenue from the recipients of its bounty sufficient to keep it in operation. It must not go beyond self-support. When a charity embarks in business for profit it is liable to taxation like any other business establishment; but so long as the trustees of the school manage it as a charity, giving the benefit of what might otherwise be profit to the reduction of tuition fees or the increase of the number of free scholars in furtherance of the "education of youth," the corpus of the trust, the schoolhouse, is entitled to exemption.

It represents the gift of private persons and of the state. It is, as we said in Northampton County v. Lafayette College, the educational plant, and, so long as it is used to provide

education at the mere cost of teaching alone, and is open to the public, it does not lose its character as a charity.

A hospital erected and equipped by public or private charity might be conducted with such skill and economy as to become self-sustaining, but it would not thereby lose its character as a purely public charity. A private hospital, built and conducted as a business enterprise, stands upon widely different ground. There is no trust involved, no charitable use impressed upon such an establishment; nothing has been done or given by the proprietor in relief of the public, but he holds the title to his own property and conducts the business for his own profit. If it proves unprofitable he may close it up or devote his plant to such other purposes as he will.

In the case before us the donors parted absolutely with what they gave. It was devoted to a charitable use and the title placed in trustees. The trustees have invested it in a plant adapted to the purposes of the trust. By the use of this plant they are enabled to conduct a school that gives educational advantages to some free, and at a low cost to all, and thus make the charity pay the expenses of its own administration.

The school is maintained by the use of its plant, the gift of both public and private charity, for the legitimate purposes of the trust and in exact accordance with the will of the donors. It is therefore maintained by charity within the meaning of the Act of 1874. The fact that the school is under the control of a denomination or religious sect, and that a preference is given to children of parents connected with the denomination, does not destroy its character as a public charity, since no one is excluded by reason of denominational connection or preference, but such persons are admitted as fast as vacancies occur : Price v. Maxwell, 28 Pa. 23 ; Donohugh's Appeal, 86 Pa. 306.

The decree of the court below is affirmed as modified by this opinion. And now, March 28, 1892, it is ordered, adjudged and decreed that the Academy of the Protestant Episcopal Church in the city of Philadelphia, is an institution of learning maintained by public and private charity, and that its real estate at the southwest corner of Juniper and Locust streets, described in the bill filed in this case, and used exclusively for school purposes, is exempt from taxation under the

provisions of the act of the general assembly approved on the 24th of May, 1874, so long as no income is derived from it by the contributors or by the corporation other than that necessary to make the charity self-sustaining. It is further ordered that the appellants be enjoined from collecting taxes now assessed upon said real estate. The costs to be paid by the appellant, the city of Philadelphia.