# Centennial and Memorial Association of Valley Forge.

*Trusts and trustees—Charitable use—Valley Forge—Corporations—Shares.*

1. The Centennial and Memorial Association of Valley Forge incorporated as a corporation of the first class under the Act of April 29, 1874, P. L. 73 "to purchase, improve and preserve the lands and improvements thereon occupied by General George Washington at Valley Forge, and maintain them as a memorial park for all time to come," was engaged in a public work and its funds, accruing partly from general contributions, and partly from payments made by the State in condemnation proceedings under the Valley Forge Park Act of April 7, 1905, P. L. 117, were properly awarded upon the formal dissolution of the association to the Commissioners of the Valley Forge Park appointed under the Act of May 30, 1893, P. L. 183 "for the purpose of perpetuating and preserving the site upon which the Continental Army under General George Washington was encamped in winter quarters at Valley Forge."

2. The fact that the Centennial and Memorial Association of Valley Forge had issued shares of stock was held immaterial in such case where it appeared that such shares lacked the essential features of shares of stock, giving to their owners no rights to dividends, and contemplating no rights to share in the property.

3. On the dissolution of a charitable association the property of the association does not revert to the donors, nor may it be divided among the members of the association, but it must be appropriated to the purposes most nearly akin to the intent of the donors under the direction of the court.

4. A charity in a legal sense may be defined as a gift to be applied consistently with existing laws for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.

5. Under the law no public trust or charitable use can fail for want of a trustee.

Argued Jan. 29, 1912.   Appeal, No. 314, Jan. T.,

1911, by Henry J. Stager and Henry J. Stager, Trustee, from order of C. P. Montgomery Co., June T., 1910, No. 32, dismissing exceptions to auditor's report In the Matter of the Audit of the Account of the Centennial & Memorial Association of Valley Forge. Before FELL, C. J., BROWN, POTTER, STEWART and MOSCHZISKER, JJ. Affirmed.

Exceptions to report of W. F. Dannehower, Esq., auditor.

The opinion of the Supreme Court states the case.

*Error assigned* was order dismissing exceptions to auditor's report.

*James H. Wolfe,* for appellant.—The money was not given gratuitously in this case; it was given for stock, a thing of value, which was sold by the Association and purchased by the exceptants. The money was not given in relief of public burdens or for the advance- ment of the public good. The public found a burden, not relieved, but imposed, by this Association, in the form of a charge of ten cents per individual, every time a part of the public sought admission to Headquarters of General Washington at Valley Forge, whilst prior to the acquisition of the property by the Association, any person may possibly have been admitted free to the Headquarters by merely asking the owner. How did this Association promote the welfare of the community or of mankind at large, or advance the public good by its ownership of the Headquarters? The public was not the beneficiary when it paid ten cents per capita for admission to the Headquarters, any more than it is the beneficiary when paying five cents per capita to enter trolley cars for a ride in Philadelphia.

Charity is understood to refer to something done or given for the benefit of our fellows or the public: Knight's Estate, 159 Pa. 500.

*Samuel W. Pennypacker,* with him *Richmond L. Jones* and *J. P. Hale Jenkins,* for appellee.—While the certificates issued were called stock, this was done only for convenience. They had none of the features of stock, except that the holders were entitled to elect directors. They were in effect certificates that the holder had contributed one dollar for the purposes of the charity, and were made handsome so that they could be framed as an evidence of patriotic interest: Neiler v. Kelley, 69 Pa. 403.

This case is controlled by Donohugh's Appeal, 86 Pa. 306.

Where a corporation is organized for charitable purposes as for "the protection of the property of our fellow citizens from fire" and not for the private gain of its members, a trust inheres in the property, and the proceeds cannot be divided among its members: Bethlehem Borough v. Perseverance Fire Co., 81 Pa. 445; Boyd v. Insurance Patrol of Phila., 113 Pa. 269; Humane Fire Company's Appeal, 88 Pa. 389; Riddell v. Harmony Fire Co., 8 Phila. 310; Commonwealth v. Hibernia Fire Engine Co., 1 W. N. C. 187; Thomas v. Ellmaker, 1 Parsons Eq. Cas. 98; Jones v. Renshaw, 130 Pa. 327; Fire Ins. Patrol v. Boyd, 120 Pa. 624.

OPINION BY MR. JUSTICE MOSCHZISKER, February 26, 1912:

The Centennial and Memorial Association of Valley Forge having been formally dissolved, the question is raised as to the proper distribution of its assets; and this depends upon whether or not the association was a public charity. The fund consists of moneys in the treasury of the corporation paid into Court after its dissolution. The association was a corporation of the first class created by a decree of the Court of Common Pleas of Montgomery county, July 5, 1878, under the act of April 29, 1874, P. L. 73, the charter purpose being, "To purchase, improve and preserve the lands

and improvements thereon occupied by General George Washington at Valley Forge, and maintain them as a memorial park for all time to come." Certificates of stock at the nominal value of one dollar per share were issued to the extent of about 7,600 shares, and 5,000 of these are held by the appellant as trustee for and the representative of the Patriotic Order Sons of America, a patriotic fraternal beneficial association. In 1886 there was a mortgage for $3,000 upon the property, and the Patriotic Order through appeals to its members raised enough money to pay off this incumbrance; the mortgage was not purchased and kept alive, but paid off and satisfied of record. At that time, and in consideration of the money contributed for that purpose, the certificates were issued for the shares represented by the appellant.

By the act of April 13, 1887, P. L. 52, the State appropriated to the Centennial and Memorial Association $5,000 "for the improvement, extension and preservation" of the lands and buildings occupied by Washington as his headquarters at Valley Forge, and this sum was expended in the purchase of additional grounds and improvements. By the act of May 30, 1893, P. L. 183, the Commonwealth appointed a commission (the appellee), "For the purpose of perpetuating and preserving the site on which the Continental Army under General George Washington was encamped in winter quarters at Valley Forge," and directed the lands and entrenchments to be secured and laid out, preserved and maintained forever as a public place or park by the name of "Valley Forge;" by act of April 7, 1905, P. L. 117, the Commonwealth was given authority to secure the "Headquarters" by the exercise of the right of eminent domain, which they did in that year, and the fund in question arose primarily from the award made to the Centennial and Memorial Association in this condemnation proceeding. Subsequently, upon its petition to the Court of Common

Pleas of Montgomery county, the Association was formally dissolved by decree dated May 2, 1910. Thereafter the court appointed the Commissioners of Valley Forge trustees, and by a decree dated October 31, 1911, directed the fund to be paid over to such trustees to carry out the objects and purposes of the charitable use for which the property of the lately dissolved association had been held, in accordance with the trust declared in the charter of that corporation, as before stated. It is from this decree that the present appeal is taken. The appellant is the only subscriber to the fund who asks that the money be paid over to the stockholders for their individual purposes. He is a trustee and therefore properly feels that for his own protection, and that of those he represents, the questions raised ought to be determined by this court.

The act of April 9, 1856, P. L. 293, under which the Centennial and Memorial Association was dissolved, directs that "no property devoted to religious, literary or charitable uses, shall be diverted from the objects for which they were given or granted." The act of April 26, 1855, P. L. 328, provides that, "No disposition of property hereafter made for any . . . . . charitable use shall fail for want of a trustee;" and the act of May 9, 1889, P. L. 173, provides that no such public trust or "charitable use shall fail for want of a trustee . . . . . . but it shall be the duty of any court having equity jurisdiction in the proper county to supply a trustee." The decree of the court below was in pursuance of these statutes, and the question is, was the Centennial and Memorial Association of Valley Forge a public charity whose charter created a trust which it was the duty of the court to maintain by the appointment of a new trustee to hold the trust fund after the dissolution of that corporation.

As well stated in the opinion of the learned court below, "The attempt to formulate a definition that is so specific as to cover every public charity, is sure to prove

a failure. Charitable uses take such varied forms that a specific enumeration of the classes or objects is necessarily defective. The scope of a charitable use is well defined in Perry on Trusts, cited in Ould v. Washington Hospital, 95 U. S. 303, 'A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man.' In Episcopal Academy v. Philadelphia, 150 Pa. 565, this court said, 'Whatever is gratuitously done or given, in relief of the public burdens or advancement of the public good, is a public charity. In every such case as the public is the beneficiary, the charity is a public charity.' . . . . ." In Fire Ins. Patrol v. Boyd, 120 Pa. 624, we said: "A charity in legal sense may be more fully defined as a gift to be applied consistently with existing laws for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government."

We feel that the Centennial and Memorial Association of Valley Forge was engaged in a public work, and that the moneys given to it were in relief of a burden that might properly have been assumed by the public. Its charter purpose comprehended a public charity, and the formal public notice of the application for such charter declared the purpose of the association to be "to purchase, hold and improve the Washington Head-quarters at Valley Forge and lands adjacent thereto and appropriate them to historical and humane purposes." There was no provision in the charter or by-laws of the association looking to pecuniary returns to its members, and no dividends were ever paid or con-templated. In fact the appellant testified that it was never expected that any moneys would be divided

among the stockholders, and that the object was to maintain the "Headquarters" as a memorial. The general public were invited to the grounds and the "Headquarters"; admission to the former was free, but a fee of ten cents was charged for admission to the latter, and the money so received was applied to the expense of a care-taker. While the certificates issued were called "stock" they lacked its essential features, except that the holders were entitled to elect directors, and they appear really to have been intended as certificates that the holders had contributed for the purposes of the charity; they were engraved with some artistic skill and contained a picture of the "Headquarters", avowedly so that they might be framed and hung up as a testimonial expressive of the patriotic impulses of the contributors. In Neiler v. Kelley, 69 Pa. 403, Mr. Justice SHARSWOOD thus defines stock: "A share of stock is an incorporeal intangible thing. It is a right to a certain proportion of the capital stock of a corporation, never realized except upon the dissolution and winding up of the corporation, with a right to receive in the meantime such profits as may be made and declared in the shape of dividends." The so-called stock in this case had none of these attributes; it was more like the stock in Donohugh's Appeal, 86 Pa. 306. There the control of a library was vested in stockholders who were annual contributors and who elected a board of directors. The stock was issued for $40 per share, and was worth $25 in the market. The receipts of the library were applied to its maintenance. The public were permitted to use the books gratuitously within the library buildings, but a small payment was required for the privilege of taking them out,—the stockholders alone being permitted to do so without charge. The court held that the essential feature was that the enterprise was "open to the indefinite public" and that this marked it as a public charity. In the present case the affairs of the Memorial Association were managed in the same way by the

stockholders through a board of directors elected by them. The funds raised by contributions and admission fees were applied exclusively to the expenses of the association. In the Donohugh case the library made a small charge to any of the general public who took out books, and here the association made a like charge for admission to the Headquarters. While each of these corporations issued to contributors certificates which they called stock, yet in both instances the object was to found a public charity. In the present case the purchase of a controlling number of shares by the Order represented by the appellant could in no way affect the charitable character of the Memorial Association, and the weight of the evidence is that these purchases were made from patriotic reasons, without any expectation of return,—the contributors knowing that they were simply aiding a worthy public cause. The maintenance of this historic property "for all time to come" as a public memorial of one of the most important events in the great struggle which gave birth to our nation, can well be termed a public duty; and that it has since been so regarded by the Commonwealth is shown by the act of May 30, 1893, supra, and its supplements.

The facts should not be overlooked that the $5,000 appropriated by the State were expended by the Association in the purchase of grounds and improvements, that a large proportion of the funds to be distributed came indirectly from this source, and that one of the avowed purposes of this appropriation was the "preservation of the lands and buildings occupied by General George Washington as his Headquarters at Valley Forge." We have declared, "A public charity is but a trust and is bound to apply its funds in furtherance of the charity and not otherwise:" Fire Ins. Patrol v. Boyd, supra. "On dissolution the property of a charitable association does not revert to the donors nor may it be divided among the members of the association, but it should be appropriated to the purposes most nearly

akin to the intent of the donors under the direction of the court:" 6 Cyc. 977. By the Act of March 30, 1911, P. L. 28, the Commissioners of Valley Forge Park were expressly authorized and empowered to accept in trust "Any fund heretofore or hereafter created for the benefit or improvement of Valley Forge Park or any part thereof, by deed, bequest, devise, grant, decree or otherwise." We entertain no doubt of the right of the court to appoint the commissioners of Valley Forge Park as trustees to hold the present fund, and we are equally convinced of the propriety of that action. But at the same time we feel that the appellant, in raising the questions which we have determined, merely performed his duty as trustee for others who unselfishly and patriotically contributed to maintain an historic property for all the people, at a time when help for that purpose was sorely needed, and that he should not be fixed with the costs.

The assignments of error are overruled and the decree of the court below is affirmed, the costs to be paid out of the fund.