## PHILADELPHIA v. WOMEN'S CHRISTIAN ASS'N.

ERROR TO THE COURT OF COMMON PLEAS NO. 4 OF PHILADEL-
PHIA COUNTY.

Argued April 8, 1889—Decided April 22, 1889.
[To be reported.]

1. To exempt an institution from taxation under § 1, article IX. of the constitution, and § 1, act of May 14, 1874, P. L. 158, it is an essential feature that it be a public charity, free from any element of private or corporate gain.

2. When it is free from the latter element, and is an institution devoted to charity by its act of incorporation, its character as such charity is not destroyed if to some extent it receive a revenue from the recipients of its bounty.

3. Miller's App., 10 W. N. 168; Thiel College v. Mercer Co., 101 Pa. 530; Hunter's App., 22 W. N. 361; s. c. 1 Mona. 1; and Donohugh's App., 86 Pa. 306, explained.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS, and McCOLLUM, JJ.

No. 120 January Term 1889, Sup. Ct.; court below, No. 801 March Term 1887, C. P. No. 4.

On March 29, 1887, a case stated was filed wherein the city of Philadelphia was plaintiff, and the Women's Christian Association of Philadelphia, was defendant, and which was as follows:

And now, to wit: March 29, A. D. 1887, it is hereby agreed by and between the parties to the above suit, that the following case be stated for the opinion of the court in the nature of a special verdict:

The Women's Christian Association of Philadelphia is char-

tered by an act of assembly of the commonwealth of Pennsylvania, approved May 9, 1871, P. L. 640. Its object is the temporal, moral and religious welfare of women, especially young women who are dependent upon their own exertions for support. The charter and constitution of said association, and copies of their annual reports for 1885 and 1886, are hereto annexed as exhibits A, B, C and D, and are to be considered as part of this case stated. This association is located at Nos. 1117 and 1119 Arch street, in the city of Philadelphia, where it has a boarding department, or home for young women, an employment bureau, restaurant or dining-room, and lecture-room, and a free library. The house and lot cost $70,000, part of which was the proceeds of the sale of property in which the association was formerly located, and which was purchased with money previously given by the public; and there is a mortgage upon the premises for $36,000. The rest of the cost was contributed by the general public and the members of the association. All of the various committees, as well as the managers, hold their meetings in the association house. There is no stock in the association, and none of the corporate officers or managers receive any salary or compensation.

At the house, lodgings are furnished to women who are dependent on their own exertions for support, and who have no protector in the city, and who do not receive more than six dollars per week as wages. They pay the association from three dollars to three dollars and a half per week for their board and washing; and, if unable to pay any board and if there is any vacancy in the house, they are taken in free of expense, but are required to present themselves at the employment bureau in order to obtain employment. The employment bureau is free to all, and no charge is made or received. During the year 1885 there were 409 applications received from employers; 943 from those seeking employment, and 409 positions filled. During the year 1885 about two thousand girls under twenty-five years of age were furnished with board for one week, including the washing of one dozen pieces of clothing, at an average payment of $3.17 a week, and from sixty to one hundred girls were furnished with one week's board and washing of clothing free of all cost. The average wages received by said boarders was $4.50 per week. In connection with the

boarding department, the managers have a fund of fifty dollars, from which is loaned to those who are unable to pay their board from their own means, a sum sufficient to pay their board, and which loan is expected to be repaid by the borrowers, if they are able to do so, in small sums of ten cents or more; the object being to encourage and aid the girls in habits of providence and industry, and to raise them above the condition of mere paupers. This fund, in six year's use, has only decreased to twenty-three dollars. At the association home, in the evenings, there are classes open to all working women and girls, where they are instructed in reading, spelling, writing, arithmetic, phonography, book-keeping, dressmaking, etc., at the nominal charge of from three to five cents a lesson, which does not pay expenses, the deficiency being supplied by private donations and subscriptions from the public. In the year 1885, about 508 girls were enrolled as members of these evening classes. The library and reading-room for women and girls connected with the house is free to all women and without charge, and is supplied with carefully selected reading matter of about 2000 volumes, and is open daily. The restaurant department is open to women in the morning for breakfast for one hour; from eleven to three o'clock for dinner, and one hour for supper; and about ninety per cent of those using it are working women and girls, who always have the preference. The charges are at almost nominal prices, and range from one cent to eight cents for each separate article, the latter sum being the highest price charged for any one article.

Free meals are furnished to any deserving girl or woman who is unable to pay. In 1885, there were 150,345 meals furnished, of which more than 3,600 were free. There is no gain or profit from the restaurant or other department of the association; but, on the contrary, a deficiency every year in the general account, as may be seen by reference to the annexed reports, which is made up by private subscriptions and donations from the public.

The following is a detailed statement of the receipts and expenses of the restaurant, boarding department employment bureau, classes, etc., for the year 1885:

Statement of Facts.

RECEIPTS.

| | |
|---|---:|
| Restaurant, . . . . . . . | $8,594 67 |
| Boarders, . . . . . . | 6,354 16 |
| Lodgers, . . . . . . . | 206 23 |
| | $15,155 06 |

EXPENSES.

| | |
|---|---:|
| Provisions, . . . . . . . | $9,659 81 |
| Wages, . . . . . . . | 4,400 16 |
| Coal, . . . . . . . . | 802 50 |
| Gas, . . . . . . . | 659 07 |
| Replenishing and repairs, . . . . | 944 39 |
| Printing, Advertising and Postage, . . | 340 83 |
| Water Tax, . . . . . . | 14 40 |
| Employment Bureau, . . . . | 449 00 |
| Library, . . . . . . . | 272 85 |
| Classes, . . . . . . . | 254 00 |
| | $17,797 01 |

which shows a deficiency of $2,641.95, which is made up by donations and subscriptions of the public.

The defendant association at all times by its board of managers, carries out the provisions of article VI. of its constitution hereto annexed.

Lectures and entertainments on useful and instructive subjects from time to time are given gratuitously, and are free to all women. Physicians, lecturers and other entertainers of the women at the house give their services gratuitously.

Ground was given to the association at Asbury Park, New Jersey, upon which it has erected with money given to it by the general public, a large house which it keeps open during the hot summer months. It there receives during these months working women, for the nominal sum of $3.25 per week, the stay of any one of them being limited to two weeks. During 1885 there were 850 applications for admission to this "Sea Rest," of whom 556 were received. Of the 850 registered applicants, 224 were seamstresses, dressmakers or sewing-machine operators, 155 teachers, 109 matrons and housekeepers, 64 workers in mills, 73 saleswomen, 30 nurses, 10 milliners, 7 Bible

readers, and the remainder proof-readers, type-writers, etc.; 525 were residents of Philadelphia, 80 from towns in Pennsylvania, and the others from the immediate vicinity. The sum received from these visitors is not equal to the expenses, leaving out of view the cost of the ground and buildings and all that is ordinarily included or covered by rent.

The defendant association is ready and willing to pay to the city of Philadelphia taxes upon a portion of its property, to wit: two stables in the rear of the lot, which are not used in carrying on its work, but from which they derive a revenue.

The defendant association has been assessed for the purposes of taxation by the city of Philadelphia for the year 1886 at a valuation of eighty thousand dollars, and the board of revision of taxes have refused to exempt said association from taxation on the ground that it is not entitled to such exemption. If the court shall be of opinion that the said defendant is an association or institution of learning, benevolence, and charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity, and as such exempt from taxation, then judgment to be entered for the defendant; but if not, judgment to be entered for the plaintiff. The costs to follow the judgment, and either party hereby reserves the right to sue a writ of error therein.

On June 13, 1887, after argument, the court, THAYER, P. J., filing no opinion, directed judgment to be entered for the defendant, on the case stated. Thereupon the plaintiff took this writ, assigning the entry of said judgment as error.

*Mr. Abraham M. Beitler*, Assistant City Solicitor (with him *Mr. Charles F. Warrick*, City Solicitor, and *Mr. Robert Alexander*, Assistant City Solicitor), for the plaintiff in error:

The property is not within the exemption allowed by § 1, article IX. of the constitution, and § 1, act of May 14, 1874, P. L. 158, unless it be the property of an institution of purely public charity, founded, endowed and maintained by charity. The property cost $70,000; on this is a mortgage of $36,000. The institution is built, therefore, one half with endowed funds and one half with borrowed funds. During the year 1885,

2000 of the 2100 girls entering the association, were charged $3.17 per week each, and 100 were not charged. That is, where one girl received board and washing free, 20 were charged. During the same year, 150,345 meals were furnished to those who applied, and all were charged except 3,600. That is, the association supplied one meal free for every 42 charged. From the detailed statement of receipts and expenditures, it appears that but one seventh of the expenses were paid by charity. These facts clearly show that the property is not within the exemption : Hunter's App., 22 W. N. 361 ; s. c. 1 Mona. 1 ; Miller's App., 10 W. N. 168 ; Thiel College v. Mercer Co., 101 Pa. 530.

*Mr. George Junkin* (with him *Mr. Charles E. Lex*), for the defendant in error :

The character of this association is general and public : it is for the " temporal, moral and religious welfare of women, especially young women." All are to be benefited alike, without limitation or restriction ; all are to be placed on the same level. This makes the charity purely public, and gives it an indefinite or unrestricted quality. It does not take from the public character of the charity, that the girls are charged some slight amount for what they receive. It is analogous to the charge made by a library company for books taken out, or as in the case of the Young Men's Christian Association, where a charge was made for the use of the library and gymnasium. Such regulations are necessary and proper for the control and government of the association, and to prevent any abuse of its charity, by preventing pauperism and making the girls self-dependent and raising them up out of the depths to which they would otherwise be dragged, did they accept charity, as a beggar accepts alms at the door. Surely this is an association and institution of benevolence and charity that seeks to accomplish such ends : Price v. Maxwell, 28 Pa. 23 ; Miller v. Porter, 53 Pa. 292 ; Burd Orphan Asylum v. School District, 90 Pa. 35 ; Gerke v. Purcell, 25 Ohio St. 229 ; Donohugh's App., 86 Pa. 314 ; Hennepin Co. v. Gethsemane Ch., 27 Minn. 460 ; State v. Powers, 10 Mo. App. 263 ; Gooch v. Association, 109 Mass. 551, 567 ; McDonald v. Massachusetts Gen. Hospital, 120 Mass. 432.

OPINION, MR. CHIEF JUSTICE PAXSON:

The defendant is a corporation duly chartered by the legislature, and was assessed for the purpose of taxation by the city of Philadelphia for the year 1886, at $80,000, which taxes so assessed the association declined to pay upon the ground that it was exempt from taxation as a public charity.

We learn from the case stated that "The object of the association shall be the temporal, moral, and religious welfare of women, especially young women who are dependent on their own exertions for support." The operations or working of the association also appears by the case stated, and at the risk of being prolix, I quote from it at some length: "This association is located at Nos. 1117 and 1119 Arch street, in the city of Philadelphia, where it has a boarding department, or home for young women, an employment bureau, restaurant or dining-room, lecture room, and a free library. The house and lot cost $70,000, part of which was the proceeds of the sale of property in which the association was formerly located, and which was purchased with money previously given by the public, and there is a mortgage upon the premises of $36,000. The rest of the cost was contributed by the general public and members of the association. . . . . . There is no stock in the association, and none of the corporate officers or managers receive any salary or compensation. At the house, lodgings are furnished to women who are dependent upon their own exertions for support, and who have no protection in the city, and who do not receive more than six dollars per week as wages. They pay the association from three dollars to three dollars and a half per week for their board and washing; and, if unable to pay any board and if there is a vacancy in the house, they are taken in free of expense, but are required to present themselves at the employment bureau in order to obtain employment. The employment bureau is free to all, and no charge is made or received. During the year 1885 there were 409 applications received from employers; 943 from those seeking employment, and 409 positions filled. During the year 1885 about 2000 girls under twenty-five years of age were furnished with board for one week, including the washing of one dozen pieces of clothing, at an average payment of $3.17 per week, and from 60 to 100 girls were furnished with one week's board

and washing of clothing free of all cost. The average wages received by said boarders was $4.50 per week. . . . . . Free meals are furnished to any deserving girl or woman who is unable to pay. In 1885 there were 150,345 meals furnished of which more than 3,600 were free. There is no gain or profit from the restaurant or other department of the association; but, on the contrary, a deficiency every year in the general account . . . . . which is made up by private subscriptions and donations from the public." The case stated sets forth further details which we need not dwell upon, such as educational and other advantages, evening classes, the use of a library of about 2,000 volumes, etc. It further appears that for the year 1885 the total receipts were $15,155.06, while the actual expenses, principally for provisions and wages, were $17,797.01, leaving a deficit of $2,641.95, which was made up by contributions from the public.

It will be seen from the foregoing that the object of the association is to improve the temporal, moral and religious welfare of young females who are obliged to earn their own support, and that as a means to this end, it furnishes them with food and lodging, not as paupers, but for a compensation which, while it does not compensate, aids in defraying the expenses, and thus preserves the self-respect of the recipients, while to others who are unable to pay, temporary shelter is furnished free, and aid extended to them in the way of procuring employment. All this and much more is done by a band of devoted women who labor unselfishly, in season and out of season, giving their time and labor freely, and supplying the annual deficit in the treasury by contributions from themselves and their friends. There is no element of gain in the object or operations of this association. It is a public charity, and I regard it as a short-sighted policy in the city of Philadelphia to seek to burden such an institution with taxation.

We must, however, meet the question presented, which is, whether the association is such a purely public charity as to be exempt from taxation. The city contends that it is not, for the reason that it is supported to a large extent by the charges made for board and lodging, and several of our own cases are cited in support of this position. I will refer to them in detail.

Miller's Appeal, 10 W. N. 168, was an appeal from a preliminary injunction, and, as is usual in such cases, no opinion was delivered by this court. In that case taxes were laid upon certain real estate held by the Catholic church and occupied as schools, supported in part by charity, in which children were instructed in the Roman Catholic faith, but which were open to all children without distinction of race, sex, or religious belief. Those children only paid tuition who were able to do so. This was the manner in which the schools were conducted as a matter of fact. Yet it did not appear in that case, upon the hearing upon the preliminary injunction, however the fact may have been, that the real estate taxed was stamped with any public charity; nor was there anything to show that the regulation of the schools might not have been changed at any time, and converted into a source of profit. The same is true of Thiel College v. The County of Mercer, 101 Pa. 530. The college here was incorporated to furnish education to the youth of both sexes at as reasonable a rate as possible, the students paying for board and education. So far as appeared in the case, there was nothing in its charter to stamp it as a public charity over any other college, and whatever may have been the regulations of its management, there was nothing to prevent those regulations from being changed at any time. The late case of Hunter's App., 22 W. N. 361, was also an appeal from a preliminary injunction. It was stated in the opinion of the court: "The academy is maintained from the income derived from such property as has been given to and purchased by it, and from fees for tuition, which are at a much lower rate than institutions of a like grade. No rent is charged for the use of the academy, and all the receipts and income of the incorporation, after defraying the necessary expenses of maintenance, teachers' salaries, etc., are applied to increasing the number of free scholars. . . . . Any surplus above the necessary expenses of the institution is devoted to a fund to enlarge the free scholarships, and for every $2,500 accumulated it is provided that an additional free scholarship shall be maintained." It was said in the opinion of the court: "It was incumbent on appellees to show that the institution under their care is at least substantially maintained by public or private charity. This has not been done. On the contrary, it may be fairly in-

ferred that its chief source of maintenance is and has been tuition fees. If so, it cannot, in the constitutional sense, be regarded as an institution of purely public charity." I find nothing in that case, so far as the report shows, to distinguish it from any other academy or college. It was supported in the main from tuition fees which, for aught that appears, were at the regular rates. It does not follow that because a college or a school is unsuccessful, and does not earn its expenses, that it is a public charity. And while, in each of the cases cited, it appeared that charity had been extended to some persons, and they might be regarded in part as charitable institutions, they were not purely so in a legal sense. Nor was its charitable character, in either of the cases, so stamped upon the institution itself, upon its organic law, that the mode of administering it might not have been changed at any time.

In the case in hand the stamp of charity is indelibly fixed upon the association. It appears in its charter, and is developed at every stage of its proceedings. Does the mere fact that it charges a small sum to a portion of those who feed at its table and enjoy the shelter of its roof, destroy its character as a purely public charity? The language of this court in the case last cited, severed from its connection, might appear to sustain this contention to some extent. The learned judge, however, was speaking of a widely different state of facts, and what he said was entirely applicable to the case he was discussing. This whole subject was carefully considered in Donohugh's App., 86 Pa. 306. That was the case of the Philadelphia Library, an institution maintained by the annual contributions of members, from the income derived from such property as has been given to it, and from fees paid for the use of the books. The test in that case was the object of the corporation. That was found to be the general, public good, and not private gain.

Section 1, article IX., of the constitution, provides that "The general assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, and institutions of purely public charity." The act of May 14, 1874, P. L. 158, provides that "All hospitals, universities, colleges, seminaries, academies,

associations, and institutions of learning, benevolence or charity, with the grounds thereto annexed, and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity. . . . . be, and the same are hereby exempted from all and every county, city, borough, bounty, road, school, and poor tax."

It is an essential feature of an institution claiming exemption from taxation under the constitution and the act of 1874, that it shall be a public charity free from any element of private or corporate gain. If it is free from the latter element; if it is an institution devoted to charity by the very fundamental law of its existence, is its character as such destroyed if to some extent its revenues are derived from the recipients of its bounty? As an illustration: Suppose an organization is formed for the sole purpose of supplying cheap fuel to the poor; that such object appears by its charter, and that in pursuance thereof, it furnishes coal to the poor at one half the rates usually charged therefor, and that the balance of the price thereof, or the loss occasioned by such sales, together with all the other expenses of the association, are made up by contributions from the members and the general public; that all the time and labor of the members are given gratuitously, can any one doubt that such an institution would be a purely public charity, "founded, endowed, and maintained by public or private charity?"

This association is precisely such an institution. It has no element of gain connected with it. The charge for meals and lodging is not more than one half of what would be charged for similar accommodations elsewhere. It may therefore be said to be maintained by charity: it could never have been organized except by charity; it could not be continued for a year without charity. It may be these views conflict slightly with what has been said in some of the cases referred to; it does not conflict, however, with the points decided in either of them; while they are believed to be in entire harmony with Donohugh's Appeal, supra.

Judgment affirmed.