## Harrisburg *v.* Harrisburg Academy, Appellant.

*Taxation—Exemption—School—Public charity.*

A school in the management of trustees who serve without compensation, which is entirely supported by tuition from pupils and receives besides a small rental of $150 per year paid to it by its principal for a house in which he lives, is not a purely public charity and exempt from taxation, although forty years before it received aid from the state, and contributions from private persons. Philadelphia v. Women's Christian Association, 125 Pa. 572; Episcopal Academy v. Philadelphia, 150 Pa. 565, and Philadelphia v. Pennsylvania Hospital for Insane, 154 Pa. 9, distinguished.

Argued March 16, 1904. Appeal, No. 12, March T., 1904, by defendant, from judgment of C. P. Dauphin Co., Mechanic's Lien Docket, No. 1, No. 77, on verdict for plaintiff on case stated in suit of City of Harrisburg v. Trustees of Harrisburg

Academy.   Before RICE, P. J., BEAVER, ORLADY, SMITH, PORTER, MORRISON and HENDERSON, JJ.   Affirmed.

Case stated to determine liability for a city tax.

WEISS, P. J., filed the following opinion :

The facts are agreed upon and for convenience are briefly stated as follows :

An act of assembly approved April 4, 1809, P. L. 174, established in the borough of Harrisburg, "an academy or public school for the education of youths in useful arts, sciences and literature, by the name and style of 'The Harrisburg Academy.'"

It designated certain persons trustees who, and their successors duly elected, were declared a body corporate and politic by the name and title of "the trustees of Harrisburg Academy;" by which name the body was to have perpetual succession and be competent to take and hold to them and their successors for the use of the academy lands and property of every kind by grant, devise, bequest, or gift and to sell and dispose of the same to like use and erect all necessary buildings and manage the affairs of the school for its well-being.   By the seventh section of the act, the sum of $1,000 was appropriated and granted out of any unappropriated money in the state treasury unto the trustees "to unable them to purchase a lot of ground, whereon to erect a suitable building for the said academy or public school," and to purchase "a pair of globes" and "astronomical and mathematical apparatus."

The legislature also granted by an act approved March 28, 1814, P. L. 240, a tract containing some fifty-six perches of the public ground situate at the corner of High and Walnut streets, unto the trustees of the academy, "for the purpose of erecting a building for said academy, and for no other purposes whatsoever."

By the provisions of the Act of March 3, 1818, P. L. 132, $1,000 was appropriated and paid to the trustees towards the payment of the debts of the academy, "and to the completion of the building erected for the said academy."

In the year 1827 the state purchased from the trustees the lot of ground at High and Walnut streets for the sum of $500, pursuant to an act of assembly.

On April 9, 1833, P. L. 481, the sum of $500 was, pursuant to the seventh section of the act, appropriated and paid to the Harrisburg Academy, since which date no appropriation of state moneys was made to the academy.

Some time in 1827, or shortly afterwards, the trustees erected the present academy building on a lot fronting on Front street, about 103 feet, and extending in depth about 119 feet, upon part of which was theretofore erected the building now occupied by the principal as a residence.

Large amounts were subscribed and paid by citizens—chiefly during the year 1814—towards the support of the institution, but no donations or subscriptions of a public or private character have been made toward its maintenance for a period of more than forty years.

The principal of the academy resides on the premises in what is known as the Maclay Mansion, who pays the trustees a nominal rent of $150 a year, and charges the students less than the customary rates for tuition charged in institutions which are conducted for profit. The tuition charges of those in attendance vary in amount, and all, or nearly all, pay less than full rates charged for the year 1901.

The institution has been, and is now, conducted free from any element of profit; the trustees receive no compensation and nothing for tuition beyond the actual cost, including instructors' salaries, repairs and insurance.

The city of Harrisburg assessed and levied a tax for city purposes upon said lot and buildings for the year 1901 at the rate of seven mills upon a valuation of $27,500, or $192.50, and claims the right to recover the said amount, with accrued penalties, from the defendant.

The question raised by the case stated is, whether the lot of ground, with the buildings, is chargeable with the tax levied against it, and the defendant is liable therefor.

The defendant claims immunity from taxation for municipal purposes on the ground that the institution was founded and endowed, and is purely a public charity, and asserts that the facts bring it within the provisions of article IX, section 1 of the constitution of the state, and section 1 of the Act of May 14, 1874, P. L. 158, which ordain, respectively, as follows :

" All taxes shall be uniform, upon the same class of subjects,

within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws; but the general assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, and institutions of purely public charity.

" . . . . All hospitals, universities, colleges, seminaries, academies, associations of learning, benevolence or charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, found endowed and maintained by public or private charity . . . . be, and the same are hereby, exempted from all and every county, city, borough, bounty, road, school and poor tax : Provided, that all property, real or personal, other than that which is in actual use and occupation for the purposes aforesaid, and from which any income is derived, shall be subject to taxation, except where exempted by law for state purposes, and nothing herein contained shall exempt same therefrom."

The clause of the constitution quoted simply enumerates the subjects which the legislature may, by general laws, exempt from taxation, and emphasizes the observance of uniformity in respect of exemption as distinctly as that which it imposes upon all taxes to be levied and collected under general laws upon the class of subjects specified in the article and section.

This case has to do with that class of subjects authorized by the constitution to be exempted and designated as " institutions of purely public charity;" and the act embraces among and within its relieving provisions " institutions of learning, benevolence or charity . . . . found, endowed and maintained by public or private charity."

The state appropriated moneys to the trustees extending over a period of a quarter of a century. Private contributions were also made during at least the early part of the academy's existence, and the trustees administered, and do yet administer, its affairs. " Funds supplied from the gift of the crown, or from the legislation, or from private gift for legal, general or public purposes are charitable funds "—Thomas v. Ellmaker, 1 Parsons, 98—and it is beyond dispute that the academy was "found, endowed and maintained by public or private charity," and by both for many years.

It "receives among its pupils those who by reason of age are debarred from receiving instruction at the common schools," which must be understood to signify that it "is open to the indefinite public" and that, in the language of Donohugh's Appeal, 86 Pa. 306, "gives it its public character." The charity is, or at least has been "completely, entirely, unqualifiedly" and "wholly" public, and therefore "purely" public, which characteristics bring it, as it was once conducted, within the constitutional phrase a "purely public charity."

Were the academy, with the grounds and buildings annexed and necessary for its occupancy, the same as it was forty and more years ago, the premises would undoubtedly be exempt from the levy and collection of all municipal taxes. But since that time "the income derived from tuition charges" have been "sufficient to pay for the maintenance of said academy during said time," and these are augmented by the annual rent of $150 paid by the principal for the residence, buildings and grounds.

When the academy ceased to be supported and maintained by voluntary contributions, and became self-sustaining from the income derived from tuition charges and rental, it ceased to be a distinctively charitable institution within the meaning of the exempting act, notwithstanding that it "has been, and is now, conducted free from any element of profit." This is so not because it is not conducted for gain or profit, but because by becoming self-supporting it lost its purely charitable quality in respect of its immune privilege: Moore v. Taylor, 147 Pa. 481; Philadelphia v. Jewish Hospital Association, 148 Pa. 454; American Sunday School Union v. Philadelphia, 161 Pa. 307. The significance of this inference lies in the summary of White v. Smith, 189 Pa. 222:

"I think the distinction between a public charity supported almost wholly by voluntary contributions, but which, by a reasonable regulation necessary for the preservation and care of its property, incidentally realizes a small income, and a charity which collects from its beneficiaries six sevenths of its whole income, is quite obvious;" and in the still more suggestive declaration, p. 232, that if the institution "ceases to be that on which it depends for exemption, the property at once becomes subject to taxation."

The appropriations and contributions made toward the uses

of the academy constituted the fund a trust for the benefit of
the public, and the incorporating act appointed the corporate
body trustees for its administration.

Gifts of this kind are the expressions, if not the essence, of
charity, which "seeketh not her own," and the moment they
are withheld and the institution is maintained by revenue de-
rived from tuition paid by pupils, it is no longer a purely char-
itable enterprise.

It is this voluntary character of the bounty which determines
exemption from, and its absence which entails subjection to,
taxation.

At least we understand this to be the test which the Su-
preme Court, in White v. Smith, 189 Pa. 222, applies in decid-
ing the case, and in distinguishing it from Philadelphia v.
Women's Christian Association, 125 Pa. 572, where it is held
that "it is an essential feature of an institution claiming ex-
emption from taxation under the constitution and the act of
1874, that it shall be a public charity free from any element of
private or corporate gain."

There would scarcely be a question as to the liability to taxa-
tion if the academy had been organized and conducted just as
it was with the source of revenue it now has, minus the public
and private contributions.

There can be as little doubt as to its taxable liability, since
it has become self-supporting, or maintained from sources other
than charitable, for self support and charitable support are not
only corelated, but bear widely different relationship to the ex-
empting act.

Its chief support is derived from tuition and not from the
small rental which is the product or outgrowth of the dona-
tions made from time to time; and it is said in White v. Smith,
supra, 229, that if the support of the library in Donohugh's
Appeal, supra, "had been derived from hiring of its books to
the public, the conclusion would have been the opposite one to
that adopted."

The close case—where revenue derived from noncharitable
sources not incidental to administrative regulations, and those
derived from actual charitable sources by the same institution
of learning, equal each other, or nearly so—is not presented.

Compared with the value of the property the rental paid is

258 HARRISBURG *v.* HARRISBURG ACADEMY, Appellant.

Opinion of Court below—Opinion of the Court. [26 Pa. Superior Ct.

probably small, but the rule that property no longer impressed with the stamp of pure public charity, or maintained by it, must answer in taxes proportioned to its enhancement in value for protection afforded, is inexorable.

The facts press upon us the conclusion that the property belonging to the defendant, and fully described in the case stated, is subject to taxation, and judgment is accordingly given and directed to be entered in favor of the plaintiff and against the defendant for the city tax assessed for the year 1901 in the sum of $192.50, with accrued penalties, which may be computed and added to the amount of the tax.

An exception is noted for the defendant pursuant to a provision in the case stated to that end, and the same is sealed accordingly.

*Error assigned* was the judgment of the court.

*Levi B. Alricks*, with him *John H. Alricks*, for appellant.— The school is exempt from taxation : Donohugh's App., 86 Pa. 306 ; Northampton Co. v. Lafayette College, 128 Pa. 132; Philadelphia v. Women's Christian Assn., 125 Pa. 572.

*Daniel S. Seitz*, city solicitor, for appellee, cited : Thiel College v. County of Mercer, 101 Pa. 530 ; Donohugh's App., 86 Pa. 306 ; Miller's App., 10 W. N. C. 168 ; Hunter's App., 22 W. N. C. 361.

OPINION BY RICE, P. J., October 17, 1904 :

We think this case was correctly decided in the court below. The opinion of its learned president judge has left little to be added in support of the judgment. What we have to say is confined mainly to a consideration of three cases which the learned counsel for the appellant regard as conclusively deciding the other way the question of law arising upon the admitted facts. They are Philadelphia v. Women's Christian Association, 125 Pa. 572, Episcopal Academy v. Philadelphia, 150 Pa. 565, and Philadelphia v. Pennsylvania Hospital for Insane, 154 Pa. 9.

In the Women's Christian Association case, Chief Justice PAXSON stated the essential facts in detail and then summarized

them as follows: " It will be seen from the foregoing that the object of the association is to improve the temporal, moral and religious welfare of young females who are obliged to earn their own support, and that as a means to this end, it furnishes them with food and lodging, not as paupers, but for a compensation which, while it does not compensate, aids in defraying the expenses and thus preserves the self-respect of the recipients, while to others who are unable to pay, temporary shelter is furnished free, and aid extended to them in the way of procuring employment. All this and much more is done by a band of devoted women who labor unselfishly, in season and out of season, giving their time and labor freely, and supplying the annual deficit in the treasury by contributions from themselves and their friends. There is no element of gain in the object or operations of this association."

In the Pennsylvania Hospital case it appeared, that within the portion of the grounds charged with the claim in suit there was a large building reserved exclusively for the use of patients paying a higher rate than any others; that while these payments exceeded the cost of maintenance assignable to themselves, if the original cost of the property and any estimated rental were excluded, yet if these were to be taken into consideration no actual profit was realized; that the apparent profit was used in extending the hospital capacity for good among the destitute members of the community and no portion of it enured to the benefit of any person concerned in administering the charity; and that there was annually more money expended by the defendant in carrying out the purpose of its incorporation than was received from all sources of its income, and this deficit was made up by annual contributions and donations made to it from time to time.

These two cases are easily distinguishable from the case before us and do not necessarily rule it. They go only to the extent of deciding that an institution that is in its nature and purpose a purely public charity does not lose its character as such under the tax laws, if to some extent it receives a revenue from the recipients of its bounty. But in the Episcopal Academy case Mr. Justice WILLIAMS, after referring to what the Women's Christian Association case decided, said: " We are now disposed to go further, and say that an institution that is

in its nature and purposes a public charity does not lose its character as such under the tax laws if it receives a revenue from the recipients of its bounty sufficient to keep it in operation. It must not go beyond self-support. When a charity embarks in business for profit it is liable to taxation like any other business establishment; but so long as the trustees of the school manage it as a charity, giving the benefit of what might otherwise be profit to the reduction of tuition fees or the increase of the number of free scholars in furtherance of 'the education of youth,' the corpus of the trust, the schoolhouse, is entitled to exemption." That no part of this can be rejected as the mere dictum of the justice writing the opinion and that it expressed the judgment of the court upon a question which they considered was raised by the pleadings and evidence, is shown beyond all question by the decree itself, which was, that the defendant's real estate, "used exclusively for school purposes, is exempt from taxation under the provisions of the act of May 14, 1874, P. L. 158; so long as no income is derived from it by the contributors or by the corporation other than that necessary to make the charity self-sustaining." Speaking of the point decided in this case Mr. Justice DEAN said in a later case: "The school was founded and endowed by public and private charity; the rates of tuition were adjusted with a view to make the school self-sustaining; a majority of the pupils paid full rates, a small number half rates, and a still smaller number nothing. It was held to be a purely public charity, because its revenues only made it self-supporting, but it was distinctly intimated that if the revenues had gone beyond the line of self-support it would not have been exempt:" American Sunday School Union v. Philadelphia, 161 Pa. 307. It is thus seen that the suggestion of appellee's counsel, that the controlling fact in these three cases was that the institutions seeking exemption had not sufficient income to maintain them, but had to depend upon voluntary contributions to meet the necessary running expenses, cannot be sustained, so far, at least, as the Episcopal Academy case is concerned. It has been declared, however, that in these cases, and especially the latter, the "court went to the outside limit of liberality in construction of the constitution"—American Sunday School Union v. Phila-

delphia—and that "they can be sustained only by a very liberal construction of the act of 1874, and they go in the direction of exemption to the uttermost limit of such construction"—per DEAN, J., in White v. Smith, 189 Pa. 222—but they have not been distinctly overruled. On the contrary, the learned justice, evidently speaking for the court, said in White v. Smith: "We have no desire to disturb the judgments in the three cases cited; they stand on the facts peculiar to them, and are outside the line of cases which follow Donohugh's Appeal." Speaking further of the prominence given them "to the one fact, the absence of corporate or private gain," he said: "We will not open the road further in that direction, because both the constitution and the statute obstruct it; and it is immaterial whether the courts break through or go around this obstruction, the end is the same; the very thing which the constitution sought to cure as a legislative abuse will become a judicial one." Assuming, then, that the Episcopal Academy case may still be regarded as an authoritative precedent in cases where the essential facts are the same, but that the doctrine of the case is not to be extended one jot further, it becomes our duty to examine critically the agreement as to the facts and to determine therefrom whether this is such a case. The facts relative to the founding and the endowment of the academy need not be recited at length in this opinion. It is sufficient to say, adopting the language of Judge WEISS, that "it is beyond dispute that the academy was 'founded, endowed and maintained by public or private charity' and by both for many years." But for more than forty years, including the tax year in question, no private or public donations or contributions of any kind or character were made to the academy for the maintenance thereof. The premises consist of a lot having a frontage of about 103 feet, and a depth of about 119 feet upon which is erected the academy building, and another building, known as the Maclay Mansion, used as a residence for the principal. He pays to the trustees "a nominal rent of $150 per annum for the buildings and grounds, and charges the scholars for tuition less than the rates usually charged for similar tuition in academies conducted for profit; said charges ranging from $50.00 to $70.00 a pupil per annum, some being charged a less rate, and some, nothing." There are three teachers, including the principal, who are paid the aver-

age salaries paid for similar services in the locality. The trustees receive no compensation for their services. Whilst no more is received for tuition than "actual cost, including instructors' salaries, light, heat, repairs and insurance," yet it is admitted that "the income derived from tuition charges" has been "sufficient to pay for the maintenance" of the institution for forty years and more. It is stated that "the institution has been, and is now, controlled free from any element of profit," and this is doubtless true, if the full rental value of the premises for any purpose to which they are adapted is to be added to the sums paid for salaries, light, heat, repairs and insurance in ascertaining the cost of maintenance. But there is no warrant for holding that that is the test by which to determine whether an institution, founded and endowed by public or private charity, is or is not self-sustaining within the meaning of the decisions cited. Notwithstanding the rather indefinite and vague allegation that the institution is controlled free from any element of profit, the fact remains that in addition to the income from tuition charges, which was admittedly sufficient for the maintenance of the institution, the corporation received as rent of the buildings and grounds $150 a year. This is called a "nominal rent," and the sum is not large, it is true, but it is not so small as to be within the maxim de minimis. To what purpose this sum was devoted does not appear, nor is it material to the decision of the case that we should know, in view of the admission that the revenue derived from other sources made the institution self-sustaining. We need not discuss the case further. If the constitutional provision, and the act of 1874 were to be construed in this case for the first time we should feel constrained to conclude from the admitted facts that the defendant's property is not exempt from taxation. We are equally clear in our conviction that to hold it to be exempt we would be required to extend the doctrine of the three cases relied on by the learned counsel for the appellant to a point beyond where it had thus far been carried.

Judgment affirmed.