## Young Men's Christian Association's Appeal.

*Charles A. Locke, William F. Knox* and *Smith, Buchanan, Scott & Gordon,* for appellant.

*W. Heber Dithrich,* county solicitor, for appellee.

REID, J., July 16, 1930.—This is an appeal to the court by the Young Men's Christian Association of Pittsburgh from the dismissal by the Board for the Assessment and Revision of Taxes of an appeal to that board from the assessment of taxes against the real estate of the association for the year 1925. The delay in the disposition of the case is due to the fact that the parties allowed it to rest *in statu quo* until about six months ago.

### Statement of question involved.

Whether or not the real estate of the appellant association, situate at the corner of Wood Street and Third Avenue, in the City of Pittsburgh, on which is erected an eighteen-story brick and steel building (including mezzanine and basement), used entirely for the activities of what is known as the Downtown Association, is entirely exempt from assessment for taxation, for the reason that it is a purely public charity.

The Young Men's Christian Association, owner of the building above referred to, was originally chartered by Act of Assembly approved July 8, 1869, P. L. 1280, which was later amended by decree of the court of common pleas approved February 27, 1882, and recorded in Charter Book 7, page 114.

The purpose of the association, as stated in the charter, is "improving the spiritual, intellectual and social condition of the young men of the two cities of Pittsburgh and Allegheny and vicinity." There is no occasion to elaborate upon the provisions of the original charter or its amendments, or upon the charter granted to the Women's Christian Association by the Act of April 10, 1868, P. L. 788, which is referred to as being the basis of the powers granted to the incorporators. There is no doubt, and we so hereafter find, that the appellant association has, since its incorporation, complied with the purpose for which it was incorporated and faithfully carried out that purpose by devoting itself to the improvement of the spiritual, intellectual and social conditions of the young men contemplated in the articles of the association.

The Constitution of Pennsylvania, in article nine, section one (as amended November 6, 1923), provides:

"All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws; but the General Assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, institutions of purely public charity, and real and personal property owned, occupied, and used by any branch, post, or camp of honorably discharged soldiers, sailors, and marines."

This provision is made effective by the Act of Assembly of April 9, 1921, P. L. 119, which provides as follows:

"Section 1. Be it enacted, etc., That all churches, meeting-houses, or other regular places of stated worship, with the ground thereto annexed necessary for the occupancy and enjoyment of the same, all burial grounds not used or held for private or corporate profit, all hospitals, universities, seminaries, academies, associations, and institutions of learning, benevolence, or charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by the public or private charity; Provided, That the entire revenue derived by the same be applied to the support of and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose, . . . are hereby exempted from all and every county, city, borough, township, bounty, road, school, and poor tax; Provided, That all property, real or personal, other than that which is in actual use and occupation for the purposes aforesaid, and from which any income or revenue is derived, shall be subject to taxation, except where exempted by law, for State purposes, and nothing herein contained shall exempt same therefrom; And provided, That all property, real and personal, in actual use and occupation for the purposes aforesaid, shall be subject to taxation, unless the person or persons, association or corporation, so using and occupying the same, shall be seized of the legal or equitable title in the realty and possessor of the personal property absolutely."

*Facts.*

All the requests for findings of fact presented by counsel for appellant have been affirmed and thereby found by us. We now file them with this

opinion for reference as part thereof, if required. We shall, therefore, not again formally find the facts in detail, but merely epitomize them, referring by number to the particlar requests and findings, viz.:

In order to more effectually carry out its purpose the association, years ago, departed from the policy of operating from one center and now operates fourteen branches in different parts of the city. These from time to time, through contribution of interested citizens, are provided with standard Y. M. C. A. buildings, including, among other facilities, the following: Reading rooms, social rooms, billiard rooms, restaurants, gymnasiums, baths, swimming pools, class rooms, assembly halls and dormitories. (Finding No. 3.) These facilities are employed by the association to accomplish the purposes set forth in its charter. Membership, with full access to all facilities and service, is open to and availed of by boys and young men without regard to race or creed. These pay annual membership dues which, with other fees paid, including dormitory rentals, restaurant charges, &c., provide approximately 72 per cent. of the funds needed for operating the fourteen branches above referred to. In determining the expense for operation nothing is deducted for depreciation, obsolescence or interest on the investment, and if these charges were made, the expenses would be greatly increased. The balance of 28 per cent. of said operating expense is derived as follows: 6 per cent. for income on endowment fund and 22 per cent. from public contributions. The public, which provides this 22 per cent., has supplied the funds with which the several buildings of the association have been erected and equipped. (Finding No. 4.) The membership dues in the branches of the association and certain other charges are kept below actual cost so that boys and young men of limited means may not be debarred from the privileges of the association. To the annual deficit in operating expenses thus created is to be added the cost of different lines of service rendered throughout the community which bring little or no financial return. These include work with high school, grade school and employed boys; Bible study classes, the work of reforming delinquent boys; the maintenance of a secretary who assists at the Morals Court in the City of Pittsburgh, thus creating an annual expenditure of approximately $145,000 in excess of membership and other dues. The same remark as above also applies to any deduction by reason of depreciation, interest, etc. The only exception to the practice of charging members less than cost is that known as the Business Men's Club, where full cost is charged and the member looked upon as a source of contribution to the association in addition to his dues. All revenues received from the operation of dormitories, cafeterias, billiard rooms, barber shops, etc., are applied so as to reduce the amount which it is necessary for the association to secure each year from the public by way of contributions. (Finding No. 5.)

The board assessed the property in question for 1925 as follows: Land $412,000, building $745,000, a total of $1,157,000. The amount of tax imposed for that year was as follows: On the lot, $2626.50, building $4749.38, a total of $7357.88. Since the filing of the appeal, the board, however, revised the assessment, allowing the valuation to remain as above stated, but reduced the tax one-half, upon the theory that approximately 50 per cent. of the land and building is subject to taxation.

Through funds secured by contributions from the public, the association erected on its lot at the corner of Wood Street and Third Avenue, in the City of Pittsburgh, its largest building, known as the "downtown branch," which was completed and occupied in October, 1924. It covers the entire area of the lot (86 x 120.43 feet) and includes facilities found in similar buildings in

other metropolitan centers. The basement, among other rooms, contains the cafeteria and the barber shop. The first floor contains, among other rooms, the billiard room and soda fountain. The sixth to fifteenth floors, inclusive, contains 276 bedrooms, each floor being provided with a general wash, bath and toilet room. These floors are used exclusively for dormitory purposes. (Finding No. 7.)

The details of the other floors appear by reference to Finding No. 7. The foregoing are mentioned specifically for the reason that it is contended by the board that part of the property is assessable on account of the use made by cafeteria, barber shop, tailor shop and dormitory space.

The total number of square feet is 113,164. The number of square feet used for kitchen, kitchen storage and cafeteria is approximately 5 4/5 per cent. of the total space, or 6640 square feet; the number of square feet used by the barber shop is approximately 4/10 of 1 per cent., or 450 square feet. The following statistics for the year 1925 indicate the character and extent of the work done by the association: Number of members, 8334; 299 students spent 20,590 hours in class work; 362 gymnasium classes for boys and 769 gymnasium classes for young men and men; 7334 boys and 19,012 young men and men attended gymnasium; 331 classes in swimming for boys and 529 classes for young men and men; 10,902 boys and 14,742 young men and men used the swimming pool; 208 Bible classes for boys organized with 8668 boys in attendance and 139 Bible classes for young men and men organized with attendance of 17,137. (Finding No. 8.)

The operation of the downtown branch results in an annual deficit which is made up by public subscription. This, without charging for interest on investment, depreciation, etc., amounts to approximately $25,000. If proper charge made against it for interest, etc., this deficit would be increased by at least $95,000 per annum. (Finding No. 9.) The entire revenue from the downtown branch building is applied to its support and to add to its efficiency and its facilities as well as for repairs to the building and for no other purpose. (Finding No. 10.) The association has a total membership in all its branches of about 17,000 boys and young men, exclusive of those whom it serves through clubs and extension work. (Finding No. 11.)

Dormitories are used almost entirely by young men, their average age being twenty-three. Permanent guests are about 95 per cent. of the total. Admission to them is based on membership or an application for such, without which no one will be received; the applicant agrees to forward the interest of the association. It is neither the purpose nor practice of the association to act as a hotel. Single rooms are from $5.50 to $7.50 a week and double ones from $4.50 to 5.50 per week. Each dormitory floor is in charge of a mature man of good character, who supervises the men on his floor and coöperates with the secretaries and other officers in encouraging the occupants of the dormitories to participate in the religious, educational, social and athletic activities of the association. Occupants of dormitories are encouraged to join educational classes and clubs, to affiliate with some church, and participate in religious work and take part in the games sponsored by the association. They afford a peculiar opportunity to bring young men who need the influence and counsel of the association officers into close contact with them, and for all these reasons necessary to carry out the charter purposes of the association. They are not operated for profit, and if a reasonable share of depreciation, obsolescence, maintenance and interest were charged, the association would sustain a loss in operating them. (Findings Nos. 12, 13 and 14.)

The cafeteria accommodates 200 persons at one time, and is used principally by residents of the building, employees of the association and members. The members constitute about 85 per cent. of the patrons. Although admitted, the public is not solicited or encouraged to patronize it, and there are no signs advertising it. Meals from the cafeteria are served at meetings of the Y. M. C. A., and religious and other groups are held at the luncheon or supper hour and the meals are served at cost. It serves three meals per day, the average price of which is about 45 cents, but some are served to the boys' groups, newsboys and foreign group at less than cost, or gratuitously. It is not operated for profit, and if a charge were made for depreciation, etc., there would be a loss which would be increased if a proper share of interest on investment were considered. The cafeteria meals, and those served in other rooms, enables the association to bring together groups of boys and young men, on whom a beneficial influence is exerted and the cafeteria is, therefore, necessary in carrying out the purposes of the association in the sense that it is highly desirable and important and materially aids in its work. (Findings Nos. 15, 16 and 17.)

A barber shop, soda fountain and billiard room and a tailor shop are maintained and operated in the building, it being the contention of the appellant that they provide necessary facilities for carrying out the charter purposes. They occupy a comparatively small part of the total floor area. None of them is conducted for profit, but to a very large extent for the use and benefit of the members or those who are entitled to use the association's facilities. They are not advertised nor in any way brought to public attention. The tailor shop is used entirely by residents of the house, and the billiard room and soda fountain and barber shop, in a great majority of the instances, are patronized by members of the association or residents of the building—although the occasional non-member, or nonresident seeking to use those facilities would not be turned away. The several facilities above mentioned, if they were charged with depreciation, obsolescence, proportion of operating expenses and interest on the investment, are all operated at a loss. We find them all to be necessary for carrying out the purposes of the association, in the sense that they materially add to the comfort, convenience and well-being of the members of the Y. M. C. A. or the residents of the institution, who are entitled to use those facilities. (Findings Nos. 18, 19, 20, 21, 22, 23 and 24.)

The testimony shows that the dormitories, cafeteria, dining rooms and kitchen, barber shop, tailor shop and the soda fountain and billiard room occupy approximately one-half of the space in the association's downtown building, and it is upon the 50 per cent. of the same thus occupied that the board has assessed the tax for the year 1925.

### Discussion.

In view of the full statement of facts above presented, which is almost entirely based upon the stipulation of counsel, there is no occasion to elaborate upon those facts or attempt to do more than apply to them the well-established principles of our numerous authorities upon the subject of exemption from taxation. Even to refer to or attempt to discuss all of them bearing upon the question involved here is unnecessary.

The following cases present the principles involved in this consideration: Dononugh's Appeal, 86 Pa. 306, defining what constitutes a public charity; House of Refuge v. Smith, 140 Pa. 387, in which it was held that a public charity did not lose its right to exemption, although the products of a farm

were used to defray a part of the expenses; Philadelphia *v.* Hospital for Insane, 154 Pa. 9. This is to the same effect and presents an instance where additional revenues from special patients were sought for the profit involved, but which holds that, taking into consideration the value of the ground, improvements and maintenance involved, there was no real profit; Pennsylvania Hospital *v.* Delaware County, 169 Pa. 305, holding that property used directly for the purpose of a charity is exempt although it is used to produce some return and thereby reduce expenses (citing the earlier cases at pages 308 and 309); and Christian Ass'n *v.* Philadelphia, 75 Pa. Superior Ct. 516, discusses the cases and holds that the property of a charitable institution which is used for profit is not exempt, but sustains the principles above stated that it will be exempt even if used to bring a return and reduce expenses. (See page 519 for authorities there cited.)

An instance in which a purely public charity was deprived of exemption on property used in an independent business and for profit is found in American Sunday School Union *v.* Philadelphia, 161 Pa. 307.

In considering the question as to what part of the property of a charity shall be exempt from taxation, a plain distinction is to be observed in every instance. Property that is not used directly for the purposes and in the operation of the charity in question is not exempt. An instance of this is presented in the last-cited case. However, where the property is utilized directly for the purpose of operating and maintaining the charity in question and not for profit, although there may be some incidental return which helps to reduce the expense, such property is exempt. This distinction is clearly indicated by the authorities above cited and seems to us requires no further reiteration.

The question here is: are all the activities or facilities maintained by the appellant in its downtown branch operated and conducted for the purpose of perpetuating the intent of the charity and to make it more effective in carrying out the charity purposes. We have found that none of these activities is carried on for profit, that they are all reasonably necessary for the successful operation of the charity and that they are, therefore, not subject to taxation.

The case of Lancaster County *v.* Y. W. C. A., 92 Pa. Superior Ct. 514, sustains the contention of the appellant. There the Y. W. C. A. maintained a farm used as a summer camp in connection with the activities of its city organization and as a part of its charitable work, and it was held exempt from taxation. Guests and visitors at the summer camp in question were charged for their meals and lodging and the proceeds went to the maintenance of the camp, any deficit coming out of the treasury. All the revenue derived from the property was applied to the support of the camp and to its repairs. It was held that the use of the property conformed to the charity set forth in the charter "in improving the physical, social, intellectual and spiritual condition of young women" and that the fact that the benefits of this charity were open to others than members was no reason for depriving it of exemption. This case presents a distinction of what constitutes necessity in connection with such charity. At page 518, the opinion states: "The question whether the camp buildings and grounds are 'necessary for the occupancy and enjoyment' of a charitable institution is one primarily for its governing board . . . The word 'necessary' as used in the statute does not mean 'absolute necessity' but rather a 'reasonable necessity.' "

Philadelphia *v.* Women's Christian Ass'n, 125 Pa. 572, presents a further instance in which it was held that a charity was not deprived of the right to exemption because it maintained a boarding department or home for young

women, an employment bureau, restaurant or dining room, lecture room and free library. For these privileges or facilities a certain charge was made to the women who patronized the institution if able to pay and in other cases they were admitted without charge. Certain lessons in bookkeeping, etc., were given for which a nominal charge was made. None of these sources of income produced a profit, nor was the institution conducted for the purpose of making a profit. It was held that these constituted a purely public charity and, therefore, were entitled to exemption.

In this connection we quote as an apt description of the Y. M. C. A. now under consideration the following language of Paxson, C. J., at page 581: "In the case in hand the stamp of charity is indelibly fixed upon the association. It appears in its charter, and is developed in every stage of its proceedings."

Chief Justice Paxson, continuing, at page 582, says: "It is an essential feature of an institution claiming exemption from taxation under the constitution and the act of 1874, that it shall be a public charity free from any element of private or corporate gain. If it is free from the latter element; if it is an institution devoted to charity by the very fundamental law of its existence, is its character as such destroyed if to some extent its revenues are derived from the recipients of its bounty?"

The question as to what constitutes a purely public charity is very fully considered in Betts v. Y. M. C. A., 83 Pa. Superior Ct. 545. At pages 548 and 549, Keller, J., outlines the aims and purposes as well as the method of operation of the Erie Y. M. C. A., which in many respects are similar to those of the Pittsburgh association:

"Its activities are directed along the lines of religious work, educational work, athletics, social welfare, boys' work and general welfare, but all are conducted with the ultimate end in view of improving the spiritual, mental and physical well-being of young men. . . . It conducts educational classes, the benefits of which may be enjoyed by non members on payment of a small fee (less than the cost of the service), . . . . It maintains a gymnasium and swimming pool for the physical well-being of the young men of the community, . . . on payment of a membership fee less than the cost of service, . . . . That young men away from home might be assured of comfortable homes surrounded by proper influences, it established dormitories and rented lodgings for less than such accommodations could be secured elsewhere, and in order that such lodgers could have good food at reasonable prices, it founded a cafeteria, to which the general public was admitted on a parity with its members. . . . It makes no profits and can declare no dividends. In its operation it incurs an annual deficit, over and above its membership fees and the receipts from dormitories, cafeteria, &c., which is made up by public subscription or recourse to the 'Community Chest.' . . . Any apparent profit or surplus from one department or activity, . . . is devoted to the general work of the association . . . ."

We might rest our conclusions as to the exemption of the appellant's property upon the following cases which are directly in point: Y. M. C. A. v. City of Easton, 3 D. & C. 562; Young Men's Christian Association's Appeal, 42 York Leg. Rec. 161. In the first of the above-stated cases, the opinion is by Stewart, P. J., and presents a very comprehensive discussion of the whole subject and reviews many of the authorities. In the Easton case, an injunction was sought to prevent the collection of taxes upon the building of the association. There, as in Erie and Pittsburgh, the association conducted certain activities which it was claimed deprived the charity of the right to claim exemption. This was chiefly based (as here) upon the proposition that the

maintenance of such activities as a dormitory, cafeteria, cigar stand, etc., deprived the association of its character as a purely public charity whose property was exempt from taxation. Judge Stewart, at page 564, says:

"With respect to the cafeteria, it was contended that as the public were allowed to use the cafeteria, that fact destroyed complainant's claim for exemption, and it was also contended that as both the sleeping-rooms and the cafeteria were conducted for intended profit, that also deprived the complainant of its exemption, *pro tanto*, as to the assessed value of the parts of the building used for those purposes. We must bear in mind that everything in the building is conducted by the association under one roof, and as part of a plan which is used in carrying on the purposes of the association. This case is not like the case of an association that occupies three or four upper floors of a building, and rents the store-rooms on the first floor, nor is it like the case of an association that conducts an entirely separate business, like that of book selling."

In Young Men's Christian Association's Appeal, *supra,* the opinion is by Sherwood, J., and relates to the appeal by the Young Men's Christian Association of York from the assessment of taxes against its building for the year 1928. There, as in the case before us, it was the contention of the City of York that the portion of the real estate owned by the appellant and used for dormitories and for a cafeteria was employed in business for profit and was, therefore, subject to taxation.

As in the other instances above referred to, the facts were strikingly similar to those in question with regard to the activities and building of the Pittsburgh association.

The following is a resumé of the facts stated by Judge Sherwood:

Appellant is incorporated for the purpose of improving the spiritual, mental, social and physical condition of young men by the support and maintenance of lecture rooms, libraries, gymnasiums, etc.; it owns a large building, the money for the erection of which was donated by the citizens of York and vicinity; it has 175 dormitory rooms and a cafeteria in the basement. These dormitories are provided so that young men away from home may be assured of comfortable lodgings, surrounded by proper influences, and they have a preference in the rental of rooms. When dormitories are not in demand by the class above stated, others may rent them and be admitted to transient membership on payment of membership fees. These dormitories are operated at a profit of about 10 per cent. of the gross rentals; the cafeteria is maintained for those residing in the building; it is open to the public, whose patronage is solicited by public advertisement, and more than one-half of said patronage comes from the general public. It is conducted at a profit; all receipts from dormitories and cafeteria are used by the association for the advancement of its general work. It is supported by membership dues and by an allowance from the "Community Chest."

The opinion then proceeds:

"There is no element of gain in the object or operation of this association. The stamp of charity is indelibly fixed upon it. It appears in its charter and is developed in every stage of its proceedings. It is maintained by membership fees, by contributions from the community chest fund and from the profits incidentally made from the dormitories and the cafeteria. It may, therefore, be said to be maintained by charity. It must be borne in mind that the very purposes of its incorporation, in addition to those specifically set forth, were such other means and services which may conduce to the accomplishment of the general objects of the association. It seems to us,

therefore, that the furnishing of meals and sleeping quarters is in line with its charter purposes."

Counsel for the board does not contend that the association is not one of purely public charity, but does maintain that the particular portion of its property used for certain purposes takes those portions out of the protection which the law throws around property used for purely charitable purposes. This relates especially to the maintenance and use of the dormitories, cafeteria, billiard room and soda fountain, barber shop and tailor shop. To support this contention, the case of Pocono Pines Assembly, &c., *v.* Monroe County, 29 Pa. Superior Ct. 36, is cited and relied upon. It, however, is easily distinguishable from the case at bar. There, the assembly was chartered as a first class corporation for "the advancement of literary and scientific attainment among the people; the study of the Bible, of the science and art of teaching, and the promotion of general culture in the interest of Christianity." The assembly, by gift and also in exchange for stock, acquired 103 acres of land in the Pocono Mountains, on which it erected an inn, recitation hall, auditorium and ten cabins or cottages for lodging purposes for those who desired to keep house. The charge for the cabins was $60 to $100 per season, depending upon the size of the cabin. Also, thirty tents were set up on the grounds, for which the charges varied, those attending the assemblies or summer schools receiving reduced rates. Assemblies were held and courses of instruction were given at the camp during the period from July 8th to August 26th. Board and lodging were furnished at less than cost to teachers attending the lectures and courses, and lectures and tuition were free to them. A prospectus addressed to the general public advertised the place as a summer health resort, open from June 1st to October 1st. Guests who did not attend the schools and assemblies were charged the usual rates for similar accommodations at resorts in that locality, and the profits were applied to the running expenses of the whole institution. On these facts, the court, after an exhaustive review of the authorities, held that the auditorium and recitation hall were exempt from taxation, but that the inn and cottages which were used in the conduct of a mountain resort for profit were subject to taxation.

Finally, in considering whether or not facilities such as the dormitories, cafeteria, barber shop, soda fountain, billiard room and tailor shop are employed directly in carrying out the charter purposes of the appellant, it should be borne in mind that the association must have contact with boys and young men. This is manifestly the essential requisite. Without such contact, it would have little chance to improve their "spiritual, intellectual and social condition;" its secretaries and educators would lecture to bare benches. What more logical and desirable way to obtain this contact could it adopt than to provide a place where young men may sleep and obtain their meals? It seems clear that such facilities must be made sufficiently convenient and attractive to induce members to use them. If, therefore, the officials, in the light of their long training and wide experience, decide that a barber shop, tailor shop, soda fountain and billiard room are required to furnish certain conveniences, once perhaps deemed luxuries, but in the present era of high standards now regarded as virtual necessities, we believe that their judgment should not be interfered with and the work of the association hampered.

Based upon all the foregoing discussion, we submit the following

*Conclusions of law.*

1. That appellant's land and building, known as the downtown branch of the Young Men's Christian Association, are wholly exempt from taxation,

including the dormitories, the cafeteria, dining rooms and kitchen, barber shop, soda fountain, billiard room and tailor shop.

2. The building referred to may be divided for the purpose of taxing a portion of it and exempting the remainder.

Having determined as above stated that the building and ground of the appellant association is entirely exempt from taxation, we, therefore, enter the following

### Order.

And now, July 16, 1930, after hearing and upon consideration, it is ordered that the appeal of the Young Men's Christian Association from the assessment of taxes for 1925 by the Board for the Assessment and Revision of Taxes for the County of Allegheny be and the same is hereby sustained. It is further ordered that the said assessment hereinbefore more particularly referred to for the year 1925 be and the same is now stricken off and the appellant entirely relieved from the payment thereof.

From William J. Aiken, Pittsburgh, Pa.